CAROLYN OWENS, Plaintiff-Appellee, v. CBS, INC., Defendant-Appellant (Delores (Brown) Burnes, Defendant).

Fifth District No. 5—87—0439

Opinion filed August 10, 1988.

Allen S. Boston and Joseph E. Martineau, both of Lewis & Rice, of St. Louis, Missouri, and Douglas P. Jacobs, of CBS, Inc., of New York, New York, for appellant.

John Long, of Sterling, Stanley & Kelley, P.C., of Fairview Heights, for appellee.

PRESIDING JUSTICE HARRISON delivered the opinion of the court:

In October of 1983, someone claiming to be Michael Brown of Centreville, Illinois, sent a letter to the White House threatening Ronald Reagan, the President of the United States, with assassination. Because the making of such threats constitutes a criminal offense under Federal law (see 18 U.S.C.A. §871(a) (West Supp. 1988)), the U.S. Secret Service initiated an investigation of the matter. The Secret Service investigation was reported by KMOX-TV, a television station located in St. Louis, Missouri, and owned by defendant CBS, Inc. (CBS), in news broadcasts which aired at 5, 6, and 10 p.m. on November 23, 1983. During the course of the 6 and 10 p.m. broadcasts, defendant CBS repeated accusations by defendant Delores Brown, sister of Michael Brown, that the letter had actually been written by plaintiff, Carolyn Owens. Those accusations were false, and plaintiff subsequently sued both Brown and CBS for libel. Following a jury trial in the circuit court of Madison County, plaintiff was awarded $280,000 in compensatory damages on her claim against CBS and $30,000 in compensatory damages on her claim against Brown. Judgment was entered on the jury's verdict, and the post-trial motion filed by defendant CBS was denied. CBS alone now appeals.

As grounds for its appeal, CBS contends that it cannot be liable as a matter of law because: (1) under the so-called "innocent construction" rule, its 6 and 10 p.m. newscasts must be interpreted as not having libeled plaintiff; (2) the "gist" or "sting" of the 6 and 10 p.m. newscasts, considered as a whole, was true; and (3) the 6 and 10 p.m.

newscasts fell within the protections of the "neutral reportage" doctrine. In the alternative, CBS asserts that even if it was properly found liable, it is nevertheless entitled to a new trial on the issue of damages because the jury's award is not supported by the evidence. For the reasons which follow, we find these contentions to be without merit. We therefore affirm.

Over the past two decades, physical assaults against national political leaders have become all too common. We are aware of no instance, however, in which the victim was forewarned of the attack by his assailant. (See *United States v. Hoffman* (7th Cir. 1986), 806 F.2d 703, 713, *cert. denied* (1987), 481 U.S. 1005, 95 L. Ed. 2d 201, 107 S. Ct. 1627.) Nevertheless, Congress has enacted legislation which provides:

> "Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States *** shall be fined not more than $1,000 or imprisoned not more than five years, or both." (18 U.S.C.A. §871(a) (West Supp. 1988).)

Pursuant to 18 U.S.C.A. §3056(b) (West 1985), the U.S. Secret Service is "authorized to detect and arrest" any person who violates this statute. A review of the case law reveals that the Federal government, with the aid of the Secret Service, has investigated and prosecuted numerous individuals under the statute during the Reagan administration.

The events which gave rise to this litigation centered on one such Secret Service investigation. The record shows that in late October 1983, a letter was mailed from Centreville, Illinois, to the White House in Washington, D.C., by someone claiming to be Michael Brown. In that letter, the author complained that President Reagan had not fulfilled his campaign promises. The author stated that he had been out of work for six months, and he threatened to kill the President, if necessary, to keep him from "doing any more harm to anyone else." After this letter was received in Washington, agents from the St. Louis, Missouri, office of the Secret Service were sent to Centreville to investigate. Centreville is a small community adjacent to East St. Louis in St. Clair County and is part of the St. Louis metropolitan area.

As we have indicated, the letter containing the death threat against President Reagan was signed by someone who claimed to be Michael Brown. The letter included Brown's correct home address,

and early on the morning of November 23, 1983, the two Secret Service agents from St. Louis went there to question him. When the agents arrived at the house, Michael Brown was still asleep, and they were greeted at the door by Michael's sister, defendant Delores Brown. While another family member went to summon Michael, the agents showed a copy of the letter to Delores. Delores denied any knowledge of the letter, but told the agents that she thought the handwriting resembled that of plaintiff, Carolyn Owens, a neighbor. Eventually, Michael got out of bed and joined the group. Although he also denied knowledge of the letter, he was taken by the Secret Service agents to the Centreville police department, which was located in Centreville's city hall.

After the Secret Service agents left the house, defendant Delores Brown went to the home of Montra Cozart, a Centreville alderman. Delores related to Cozart what had happened at her home that morning. Upon hearing the story, Cozart apparently telephoned the offices of KMOX-TV, a television station located in St. Louis, Missouri. At the time of these events, KMOX-TV was owned by defendant CBS. CBS, through its agents at KMOX-TV, then sent news reporter Robin Smith and cameraman Gerry Dawes to Centreville to do a report on the Secret Service investigation. Smith and Dawes were both employees of CBS.

While these events were taking place, the Secret Service agents arrived at the Centreville police department with Michael Brown. Based upon what Delores Brown had previously told them, the agents decided that they should call plaintiff in for questioning. Pursuant to the agents' request, the Centreville police dispatcher telephoned plaintiff at the Centreville street department, where she was employed as an administrative secretary to the superintendent of streets, and requested that she come over to police headquarters. Plaintiff was not informed as to why she was being summoned, but appeared, as requested, shortly thereafter.

Once plaintiff arrived at police headquarters, the Secret Service agents showed her a copy of the letter and questioned her about it. Plaintiff testified at trial that she thought that the handwriting in the letter resembled her own and that one of the agents told her that she had been accused by Delores Brown of being its author. Not surprisingly, plaintiff felt scared and nervous, but she protested her innocence to the agents. Plaintiff was aware that Delores Brown, who was familiar with her handwriting, had been fighting with her brother, Michael, and wanted him out of the house. Plaintiff therefore suggested to the agents that Delores had a reason for writing the let-

ter and that if she did not actually write it, she knew about it. Based upon these statements by plaintiff, Delores was also brought to the police station for questioning.

Plaintiff, Delores Brown, and Michael Brown were all held at police headquarters for several hours. While there, they were interrogated, fingerprinted, photographed, and asked to rewrite the letter several times so that their handwriting could be compared with that used in the letter. When this process was completed, the three were released and told that they would be contacted again once the Secret Service had completed the fingerprint and handwriting analyses.

In the meantime, the news crew from CBS had arrived on the scene and was at city hall as the Browns and plaintiff left police headquarters. Robin Smith, the reporter, and Gerry Dawes, the cameraman, made their way through the small crowd which had congregated there, and Smith spoke with both of the Browns for a total of between 15 and 30 minutes. After gathering background information, she interviewed them "on camera" regarding the letter and the Secret Service investigation.

Smith next spoke with plaintiff. Viewing the evidence in the light most favorable to her, as we must, it appears that plaintiff was reluctant to talk with Smith about the investigation. She testified that she actually wanted to leave the city hall through a rear door, but was prevented from doing so by a police official. She apparently consented to an interview only after Smith persisted in her questioning and suggested to plaintiff that because her name would be mentioned and the interviews with the Browns would be broadcast in any event, it might be in plaintiff's best interest to appear and present her side of the story.

Smith also attempted to interview the two Secret Service agents who were conducting the investigation. They refused comment and would only give Smith the name and telephone number of their supervisor in St. Louis. Later in the day, Smith telephoned that individual. He confirmed the investigation and the existence of the letter and apprised Smith as to the possible criminal penalties involved. He also told Smith that the Secret Service was "not sure" whether any arrests or charges would ultimately be brought, but that none would be brought that day.

No further investigation was attempted by Smith or anyone else at CBS. Smith and her cameraman remained in Centreville for only about two hours. Of that time, no more than approximately one hour and 17 minutes was spent on actual investigation by the CBS news crew. The rest of the time was spent by Smith drafting the script for

the news story on the Secret Service investigation, which she expected to be broadcast on KMOX-TV later that day.

Smith admitted that she did not call the Centreville police department to check on the background of Delores and Michael Brown, nor did she ask anyone if the Browns could be trusted. While Michael Brown told her that he thought the handwriting in the letter resembled that of plaintiff, Smith never asked how he had become familiar with plaintiff's handwriting. While Smith was told that family problems existed between Michael and plaintiff's family, she stated that it did not occur to her that Michael might have some reason not to be accurate or truthful. Similarly, there is no question that Smith had been told that Delores Brown had once held the job in which plaintiff worked at the time of the Secret Service investigation, but did not think that Brown's loss of that job might be a motive for Brown's accusations against plaintiff. While plaintiff steadfastly denied any involvement in writing the letter, this apparently meant little to Smith, who testified that she had no opinion one way or another as to whether the accusations against plaintiff made by the Browns were true.

Based upon the limited information obtained by Smith and the taped interviews she had obtained, the CBS editors at KMOX-TV decided to broadcast stories on the Secret Service's investigation during the station's 5, 6, and 10 p.m. newscasts that day. Tapes of those broadcasts were played to the jury and admitted into evidence. The 5 p.m. broadcast, which is not directly involved in this appeal, presented an abbreviated version of the story in which plaintiff was not directly implicated. The story began when a picture of the presidential seal and the words "Death Threat" were shown behind the anchorman on the screen. The anchorman then stated:

> "The U.S. Secret Service is trying to find out who sent President Reagan a threatening letter. The investigation is currently taking place in Centreville, Illinois. Secret Service agents have talked to three residents there: Michael Brown, his name was signed to the letter; Michael's sister, Delores; and their neighbor, Carolyn Owens."

Delores Brown was then shown stating:

> "Someone wrote a letter, and they said they had been out of work for six months, and Reagan was responsible, and they felt like they should kill him if he didn't straighten up, you know. And so we went through the handwriting analysis."

Michael Brown, in turn, was shown on the screen and heard to say:

> "Someone had been out of a job for six months, but they

used my name, and they wanted to kill him so he wouldn't hurt anybody else, and stuff like that."

The audience then saw plaintiff, who stated:

"The man just told us that there was [*sic*] no arrests, nothing, you know. It just had been sent to the White House, and they were just following up."

The story ended when the anchorman stated,

"No one has been charged, and the Secret Service investigation continues."

Like the 5 p.m. broadcast, the 6 and 10 p.m. broadcasts both began with introductory statements by an anchorman, behind whom the same graphic containing the presidential seal and words "Death Threat" were shown. Each of these broadcasts, however, repeated the accusations made by the Browns which suggested that plaintiff was responsible for writing the letter. The 6 p.m. broadcast proceeded as follows:

"ANCHORMAN: Secret Service agents are currently having the handwriting of some Centreville, Illinois, residents analyzed. The agents are trying to determine if the Centreville residents wrote a letter to the White House which included threats to kill the President. Newsroom's Robin Smith talked with three people who say they've been accused of being linked in this case. Robin?

ROBIN SMITH: *** Secret Service agents confirmed the existence of the letter but would not give us a copy. In the meantime, two women and one man in Centreville, Illinois, told me they have seen the letter, were questioned about whether they wrote it, but all three deny having anything to do with it.

Nineteen-year-old Michael Brown says around 8:30 this morning federal Secret Service agents showed him a copy of the letter addressed to the White House including the threats to kill President Reagan. Michael told me even though his name and address appear on the letter, he claims he did not write it.

MICHAEL BROWN: Someone had been out of a job for six months, but they used my name, and they wanted to kill him so he wouldn't hurt anybody else and just stuff like that.

ROBIN SMITH: Whose name was signed to it?

MICHAEL BROWN: Mine.

ROBIN SMITH: Did you write that letter to the President threatening to kill him?

MICHAEL BROWN: No, I didn't.

ROBIN SMITH: Around 9:30, Michael's 29-year-old sister, Delores, says Secret Service agents then picked her up for questioning. Michael and Delores say during the time they were here at the Centreville police department with Secret Service agents they were questioned extensively, and fingerprints and pictures were taken. Both Michael and Delores say they were shown the threatening letter and were asked to rewrite it for the purposes of handwriting analysis. *Delores says she did not write the letter either, but believes her neighbor did.*

DELORES BROWN: *When we were talking with them, I said that it looked like the girl's handwriting that lives across the street. They brought her down and talked to her. They already had Michael, and then they called me in. She said that I might have written the letter so, you know—like a tit for tat sort of thing. I said that I thought maybe she might have written a letter, you know.*

ROBIN SMITH: *She meaning who?*

DELORES BROWN: *Carolyn Owens.*

ROBIN SMITH: Have their [*sic*] been any problems in the past?

DELORES BROWN: Family problems, yes. Her family and our family, you know. Michael's been accused of taking things from her family's house, but no direct contact with Carolyn.

ROBIN SMITH: But Carolyn Owens also denies writing the threatening letters to the President.

CAROLYN OWENS: Fictitious. Why would I write a letter? I mean, why would I write a letter stating anything about killing a President and sign someone else's name to it? If I was dumb enough to write a letter, don't you think I'd put my own name on it?

ROBIN SMITH: What did the letter say?

CAROLYN OWENS: I'm not at liberty to say anything about the contents of the letter.

ROBIN SMITH: Two Secret Service agents who are involved in the case today refused to comment. But later the special agent in charge of the *** St. Louis Secret Service field office told me the maximum punishment for writing a threatening letter to the President is five years in prison, $1,000 fine or both. The special agent in charge of the investigation also refused to make any other comments about the case. But all three people say agents told them they may be contacted again and soon after the handwriting analysis has been completed.

ANCHORMAN: Thank you, Robin." (Emphasis added.)

The 10 p.m. broadcast proceeded as follows:

"ANCHORMAN: Close to home tonight, sources say the U.S. Secret Service is analyzing the handwriting of three East Side residents to determine if any of them threatened the President of the United States. Newsroom's Robin Smith talked with the three in Centreville early today.

ROBIN SMITH: Nineteen-year-old Michael Brown, his 29-year-old sister, Delores Brown, and their 31-year-old neighbor, Carolyn Owens, say they were all taken to the Centreville police department, and they identified these two men as the Secret Service agents who asked them if they wrote a letter which included threats to kill President Reagan. Secret Service agents confirmed the existence of a letter but would not give us a copy. Michael Brown says he did not write it, but he saw the letter. It was signed in his name with his home address, and he and his sister explained other details included in the letter.

DELORES BROWN: Basically, it was I was out of work and 'if you don't straighten up, I'm going to have to kill you.'

MICHAEL BROWN: Someone had been out of a job for six months, but they used my name, and they wanted to kill him so he wouldn't hurt anybody else, and just stuff like that.

ROBIN SMITH: Michael and Delores Brown and Carolyn Owens told me they were shown a copy of the threatening letter and then Secret Service agents asked them to rewrite that letter in its entirety for purposes of handwriting analysis. *Both of the Browns accused their neighbor, Carolyn Owens, of writing that letter*, but she also denied it, and she refused to make any other comments.

CAROLYN OWENS: I just am not at liberty to say anything about the letter.

ROBIN SMITH: All three say federal agents told them they may be contacted again—soon—after handwriting analysis is completed. Robin Smith, Newsroom report tonight." (Emphasis added.)

No charges were ever filed against plaintiff in connection with the letter. In fact, the Secret Service later telephoned her and told her that she had been exonerated. Delores Brown received a similar call. Plaintiff asked CBS to broadcast a story reporting that she had been cleared by the government, but CBS refused to do so when the Secret Service refused comment on the question of whether anyone had been

exonerated. This response was typical of the Secret Service, which later refused to cooperate in any way with either of the parties in this litigation. In fact, the Secret Service refused even to provide the parties with a copy of the letter, even though plaintiff and defendant Delores Brown had both seen it before and were fully aware of its contents. A copy of the letter was released only after defendant CBS resorted to the disclosure provisions of the Freedom of Information Act (FOIA) (5 U.S.C.A. §552 (West 1977 & Supp. 1988)). In any case, despite the lack of cooperation by the Secret Service and its unwillingness to make the exoneration of plaintiff public, the jury determined that plaintiff was not the author of the letter, and there is no serious dispute that this finding was amply supported by the evidence.

The KMOX-TV viewing area covered approximately 18,534 square miles, including 15 counties covering 8,244 square miles in Illinois. The total broadcast area included 1,016,444 households and a population of approximately 2,854,613 people. According to statistics compiled by Arbitron, a company which provides audience estimates in various television markets, the 6 p.m. newscast on KMOX-TV was viewed in 103,230 homes while the 10 p.m. broadcast was watched in 185,184 homes. In terms of actual audience size, this means that approximately 290,076 persons watched the 6 p.m. broadcast, while 522,137 persons watched the broadcast at 10 p.m.

Plaintiff was unable to view the 5 p.m. broadcast, but she testified that when she saw the broadcast at 6 p.m., she started crying because, as she explained, "[T]o me, it made me look as if I was the villain." She testified that after viewing the 10 p.m. broadcast she was even more disgusted, "because they made me look even more guilty." Plaintiff's mother testified that after the newscasts, the family was very upset. She recalled that friends and family members who had seen the newscasts telephoned that evening from as far away as Centralia and Carbondale.

After the broadcasts, plaintiff's brother, a special agent to the Illinois Liquor Control Commissioner, told plaintiff that he was glad that they did not have the same last name because of the adverse effects which the accusations might have on him in his work. As it was, he testified that people who knew of his relationship with plaintiff made remarks about his having an "assassinator" in the family. Plaintiff's cousin, who worked for the phone company in Carbondale, likewise told plaintiff that she was glad they did not share a common surname.

Plaintiff reported that when she went out shopping several days later, she was approached by someone she didn't know who congratulated her and told her, "I'm glad you wrote that letter." On other

shopping trips, people would approach her and ask her if she was "the lady from T.V." and inquired about how she "come out on President Reagan." Plaintiff testified that these other people would not walk up to her and say simply "[D]id you do this?" In plaintiff's words "They all just assumed I did it. They would say things like[,] [']I'm glad you did it.[']"

Plaintiff told the jury of two incidents following the broadcasts when someone she did not know pulled up to her house in the evening and screamed, "Dear Mr. Reagan," the introductory phrase in the letter she was accused of having written. These incidents were confirmed by plaintiff's son and daughter, who were at home when the incidents took place. At the time, the son was 13 years old and the daughter was 9 years old. When this happened, plaintiff warned the children about being careful where they went and with whom they spoke, apparently because she was concerned for their safety. Plaintiff's son testified that he was teased by children at school about his mother's involvement in the letter. He recalled that he would be sitting in a classroom when "[s]omeone would just let out, '[Y]our mom is going to kill the President.'" Plaintiff knew about this teasing, which apparently lasted "a couple of months," then began again after the end of the school year. The son testified that during the incidents in which someone screamed "Dear Mr. Reagan," at the house, he feared that someone might kill him, his sister, and his mother.

The evidence showed that these experiences had a debilitating effect on plaintiff. According to plaintiff's brother, plaintiff lost her motivation and "[h]er will is not as strong as it was before this happened." Plaintiff testified that she no longer attends church, or helps out with Girl Scouts, or goes to movies with her family, or works with the needy in East St. Louis, all of which she did before. Although plaintiff had been active in politics, attending city council meetings, driving people to the polls, and serving as a poll watcher and then as an election judge, her involvement in these activities ceased as well. The last time she served as an election judge was in November of 1984. At that time one of the other election judges told her that she was surprised to see her there considering the accusations about her regarding the letter. This sentiment was reiterated by a local alderman. She has not served as an election judge since then.

Because of the suspicion surrounding her involvement in writing the letter and because she was tired of being harassed, plaintiff began doing her grocery shopping and going to the laundromat very late at night, when she was not as likely to be recognized and bothered. Until she started doing this, an average of three to five people a week

would approach her and ask her about the letter. This would happen "not only at the grocery store, but if I stopped at a local service station for a pack of cigarettes, if I went to the welfare office, if I went to the doctor's office, just everywhere." Although, by the time of trial, nearly three years had passed since the CBS stories were broadcast, plaintiff testified that people still walked up to her and asked her about it. The result, in her words, is that "I didn't want to see people anymore."

Plaintiff was ultimately terminated from her employment, although there was some disagreement as to whether this was a direct result of the allegations made against her. In any case, the mayor of Centreville confirmed the adverse effect which the news broadcasts had on plaintiff's reputation. He testified that people were still talking about it up to a year later and that, in general, people believed the allegations which had been made against plaintiff. Although plaintiff had once aspired to holding elective office, the mayor testified that her chances of doing so have now been diminished. Plaintiff's brother characterized her standing in the community in more stark terms. He suggested that she had become an outcast.

Based upon the allegations made against her by Delores Brown and repeated by defendant CBS in its 6 and 10 p.m. news reports broadcast on November 23, 1983, plaintiff brought an action in the circuit court of Madison County charging that she had been libeled. Following a jury trial, plaintiff was awarded $30,000 on her claim against Delores and $280,000 on her claim against CBS, and the circuit court entered judgment on the jury's verdict. Delores Brown, who appeared at trial *pro se*, pursued the matter no further. Defendant CBS, however, filed a post-trial motion. That motion was denied, and CBS now appeals.

■ In this case, plaintiff's theory of recovery was that the allegations made against her by Delores Brown and repeated by defendant CBS were libelous *per se*. For language to be considered libelous *per se*, it must be so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary. (*Owen v. Carr* (1986), 113 Ill. 2d 273, 277, 497 N.E.2d 1145, 1147.) Under the common law in this State, there are four categories of words which constitute libel *per se*: (1) those imputing the commission of a criminal offense; (2) those imputing infection with a communicable disease of any kind which, if true, would tend to cause the person to be excluded from society; (3) those imputing inability to perform or want of integrity in the discharge of duties of office or employment; and (4) those prejudicing a particular party in his profession or trade.

(*Fried v. Jacobson* (1983), 99 Ill. 2d 24, 27, 457 N.E.2d 392, 394.) In the case *sub judice*, plaintiff contended that the allegations made against her fell within the first of these categories because they imputed that she had sent the letter threatening the life of President Reagan, in violation of 18 U.S.C.A. §871(a) (West Supp. 1988).

■ For words imputing the commission of a crime to be libelous *per se*, the offense must be indictable, involve moral turpitude, and be punishable by death or imprisonment rather than by a fine. (*Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, 742, 415 N.E.2d 434, 441.) The parties have agreed that the offense in question here, violation of 18 U.S.C.A. §871(a) (West Supp. 1988), satisfies these criteria. What the parties do not agree on is whether the allegations against plaintiff did, in fact, impute that she had violated this statute.

■ ■ Before statements will be judged defamatory as a matter of law, they must be considered in light of what has come to be known as the innocent-construction rule. (*Owen v. Carr* (1986), 113 Ill. 2d 273, 278, 497 N.E.2d 1145, 1147.) Under this rule, a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning. If, as so construed, the statement may be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff, then it cannot be actionable *per se*. This preliminary determination is properly a question of law to be resolved by the court in the first instance. Whether the publication was in fact understood to be defamatory or to refer to the plaintiff is a question for the jury should the initial determination be resolved in favor of the plaintiff. 113 Ill. 2d at 279, 497 N.E.2d at 1147-48.

In this case, defendant CBS argues that when the 6 and 10 p.m. newscasts are construed as a whole, they should reasonably be interpreted as simply setting forth the particulars of the Secret Service investigation and explaining why the Browns and plaintiff were involved in it. Because the newscasts point out that three people were being investigated, that the investigation was continuing, that no one had been charged or arrested, and that the statements made by Delores Brown which implicated plaintiff were presented as mere allegations, defendant CBS argues that the newscasts do not necessarily suggest that plaintiff was the guilty party and that they are therefore susceptible of an innocent construction.

The defect in CBS's analysis is that it misperceives the nature of plaintiff's cause of action. Plaintiff does not seek to impose liability on CBS based upon any direct accusations made by CBS itself. Rather, the gravamen of plaintiff's cause of action against CBS is that it

should be held liable because it republished a defamatory statement made by defendant Delores Brown. Given this, *Cartwright v. Garrison* (1983), 113 Ill. App. 3d 536, 447 N.E.2d 446, one of the principal cases cited by CBS, is not directly applicable to the situation present here. In that case, a defamation action was brought based on the contents of a newspaper article, but the issue was not whether the newspaper itself was liable, but whether the individual who made the allegedly defamatory statement to the newspaper could be held liable. The court found that the challenged statement, when taken in context and given its natural and obvious meaning, could reasonably be interpreted as not accusing the plaintiff of conduct which was actionable as a matter of law. In this case, however, we fail to see how the statements made by Delores Brown and repeated by defendant CBS on its 6 and 10 p.m. news broadcasts could reasonably be innocently interpreted.

As we have previously noted, defendant CBS reported during the 6 p.m. broadcast that, "Delores says she did not write the letter either, but believes her neighbor did." Immediately after this, CBS showed film of Delores stating:

"When we were talking with them, I said that it looked like the girl's handwriting that lives across the street. They brought her down and talked to her. They already had Michael, and then they called me in. She [plaintiff] said that I might have written the letter so, you know—like a tit for tat sort or thing. I said that I thought maybe she might have written a letter, you know."

Brown then identified the person to whom she was referring as plaintiff. Unlike *Owen v. Carr* (1986), 113 Ill. 2d 273, 497 N.E.2d 1145, another of the principal cases cited by CBS, such charges can hardly be compared to "an attorney's biased presentation of his client's view of a pending cause of action." 113 Ill. 2d at 280, 497 N.E.2d at 1148.

Defendant CBS also attempts to justify its republication of Delores Brown's statements by arguing that those statements constituted mere statements of opinion which are constitutionally protected. Although a divided panel of this court recently questioned whether an opinion defense is ever available against a claim of defamation under Illinois law (see *Costello v. Capital Cities Communications, Inc.* (1987), 153 Ill. App. 3d 956, 964-67, 505 N.E.2d 701, 706-08, *appeal allowed* (1987), 115 Ill. 2d 539, 511 N.E.2d 426), we need not address that issue here as we do not believe that the statements made by Delores can fairly be interpreted as expressions of opinion. Here, Delores made her accusations against plaintiff to a news reporter as part

of a news investigation. The accusations were of criminal conduct, and they were obviously meant to be taken literally. No reasonable person would have viewed them as mere "rhetorical hyperbole" or as having been intended simply in a "loose, figurative sense." Moreover, this is not a situation in which the terms used were so imprecise "as to make it impossible to prove the assertion false." *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 162-63, 419 N.E.2d 350, 358, *cert. denied* (1981), 451 U.S. 911, 68 L. Ed. 2d 300, 101 S. Ct. 1981.

To regard Brown's statements as being something other than a suggestion that plaintiff had, in fact, engaged in criminal activity would require a strained and narrow interpretation, which the law does not permit. To be sure, Brown was reported to have said that she "believe[d]" that her neighbor did it and that she "thought maybe [plaintiff] might have written" the letter. While such statements are less than unqualified, we have found no authority suggesting that accusation of criminal conduct ceases to become libelous simply because it has not been uttered with certainty. To the contrary, one Federal appeals court has aptly observed:

> "Almost any charge of crime, unless made by an observer and sometimes even by him [citation], is by necessity a statement of opinion. It would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words 'I think.'" *Cianci v. New Times Publishing Co.* (2d Cir. 1980), 639 F.2d 54, 64.

With respect to the 10 p.m. broadcast, defendant CBS does not and cannot assert any defense based on opinion. During that broadcast, allegations against plaintiff were not qualified by any statements that Delores Brown "thought" plaintiff wrote the letter or that plaintiff "may have" written the letter. To the contrary, the broadcast expressly stated that, "[b]oth of the Browns accused their neighbor, Carolyn Owens, of writing that letter." While CBS did attribute the accusations to the Browns and intimated no opinion as to whether those accusations were true or false, this cannot insulate it from liability. Under common law, a person who republished a defamatory statement made by another was himself liable for defamation even though he gave the name of the originator. (*Catalano v. Pechous* (1980), 83 Ill. 2d 146, 168, 419 N.E.2d 350, 361, *cert. denied* (1981), 451 U.S. 911, 68 L. Ed. 2d 300, 101 S. Ct. 1981.) In explaining the basis for this rule, one appellate court observed:

> "A man cannot say there is a story in circulation that A. poisoned his wife or B. picks C.'s pocket in the omnibus, or that D. has committed adultery, and relate the story, and when

called upon to answer say: 'There was such a story in circulation; I but repeated what I heard, and had no design to circulate it or confirm it'; and for two very plain reasons: (1) The repetition of the story must in the nature of things give it currency; and (2) the repetition without the expression of disbelief will confirm it. The danger—an obvious one—is that bad men may give currency to slanderous reports, and then find in that currency their own protection from the just consequences of a repetition." *Cobbs v. Chicago Defender* (1941), 308 Ill. App. 55, 59, 31 N.E.2d 323, quoting M. Newell, Slander & Libel §300 (4th ed. 1890).

In *Cobbs*, the appellate court applied the foregoing principle to reverse the dismissal of a complaint for libel which a Chicago minister had brought against a local newspaper known as The Chicago Defender. According to the court's summary of the complaint, the basis for the libel action was an article bearing the headline "Rev. Cobb Denies Scandal; Defends Self Against Rumors in Broadcast." The article asserted that plaintiff, pastor of a church in Chicago, was "facing the possibility of questioning by State's Attorney's Police concerning widespread rumors of a scandalous nature"; that these rumors had been so general that plaintiff had to make his defense over the air on several of his radio broadcasts, and that "the city has been astir with stories connecting the minister with an unsavory incident of serious proportions." The article further asserted that plaintiff had shown a reluctance to discuss the rumors, "and when, in response to his inquiry, was told that no public records 'of such a happening' had been found, then said he had nothing to discuss"; that well known citizens and holders of high city offices were involved in the rumor and an attempt had been made to avert a scandal; that authoritative sources had said, "The State's Attorney's office is definitely interested in the rumors and has already launched an investigation"; and that the Chicago Crime Commission and the Neighborhood Protective Association "have taken cognizance of the rumors and have assigned investigators to run them down." The nature of the rumors was not disclosed.

Viewing the foregoing allegations in light of the common law rules on libel *per se*, the court concluded,

"[T]here can be no escape from the conclusion that [the article] tended to injure the reputation of plaintiff, and especially to damage him with reference to his qualifications as a minister of the gospel. Reading of the alleged libelous matter impresses one so strongly to this effect that no argument is needed to support the conclusion that the publication was libelous *per se*."

(308 Ill. App. at 58-59.)
The case before us now involves broadcasts which imputed the commission of a criminal offense, but the conclusion reached by the court in *Cobb* is no less apt. Indeed, the circumstances here are, in at least one way, more serious. By specifically identifying what plaintiff is claimed to have done and the names of her accusers, the news stories broadcast by defendant CBS have an added measure of credibility. Of course, the very harm in rumor or gossip is that there are some who will take it as true. The more believable gossip is, the more pernicious it becomes.

■■ ■ Since *Cobbs* was decided, the absolute liability which attached to defamation at common law has been supplanted as to public officials and public figures by *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, and its sequels. Nevertheless, the republisher of a defamatory statement made by another remains subject to liability. (*Catalano v. Pechous* (1980), 83 Ill. 2d 146, 168, 419 N.E.2d 350, 361, *cert. denied* (1981), 451 U.S. 911, 68 L. Ed. 2d 300, 101 S. Ct. 1981.) Of course, where, as here, a private individual has brought suit against a publisher or broadcaster to recover actual damages for a defamatory publication whose substantial danger to reputation is apparent, the individual must now prove that the publication was false, and that the defendants knew it to be false or, believing it to be true, lacked reasonable grounds for that belief. (*Troman v. Wood* (1975), 62 Ill. 2d 184, 198, 340 N.E.2d 292, 299.) In other words, the threshold for recovery is negligence. Given the cursory investigation conducted by the CBS reporter in this case, and her complete failure to take into account facts made known to her which suggested that the Browns had a motive for fabricating their charges against plaintiff, we believe that the jury could certainly have properly found CBS to be negligent in this case. Indeed, no argument to the contrary has been made. .

■ Defendant CBS next asserts that it cannot be held liable because the contents of the 6 and 10 p.m. newscasts were true. In making this argument, however, CBS does not dispute that plaintiff was not in fact responsible for writing the letter, as she was claimed to have done by the Browns. Rather, the gist of its argument is simply that it should be protected from liability because it reported the Browns' accusations and the details of the Secret Service investigation accurately. This argument is completely without merit. As we have just discussed, the law in Illinois remains that the republisher of a defamatory statement made by another is himself liable for defamation even though he gives the originator's name. In light of this rule,

we fail to see how a person who republishes a defamatory statement can evade liability merely by showing that he has repeated it with precision. Indeed, a faithful retelling of a defamatory statement may be the most damning kind.

■■■ A third, and related, argument made by defendant CBS is that its 6 and 10 p.m. broadcasts were constitutionally protected under the doctrine of "neutral reportage." In *Fogus v. Capital Cities Media, Inc.* (1982), 111 Ill. App. 3d 1060, 1063, 444 N.E.2d 1100, 1102, this court declined to rule on the validity of that doctrine because such a ruling was not necessary in order to properly dispose of the case. The same is true here.

In *Fogus*, we held that if the neutral reportage doctrine were followed, "it would be narrowly limited to a factual situation which is presented when a responsible prominent person or organization makes serious charges against a public figure and those charges are reported in an accurate and disinterested manner." (111 Ill. App. 3d at 1063, 444 N.E.2d at 1102.) Such a view was recently adopted by the Second District in *Davis v. Keystone Printing Service, Inc.* (1987), 155 Ill. App. 3d 309, 323, 507 N.E.2d 1358, 1368-69. In the matter before us, the doctrine, even if it exists under Illinois law, cannot possibly apply. This is so for two reasons. First, plaintiff here is a private figure. Second, there is absolutely no evidence in the record suggesting in any way that defendant Delores Brown and her brother, Michael, could be regarded as "responsible prominent persons." All we really know about them is that they live near plaintiff and that they do not get along with each other or with plaintiff's family. They are unemployed, and Michael Brown is apparently referred to by the police as "a little thief."

In sum, we find untenable defendant CBS's claim that it should not have been held liable as a matter of law for broadcasting the false and defamatory accusations made against plaintiff by Delores Brown. In reaching this conclusion, we are mindful of the central role which a free press plays in advancing society's interest in "uninhibited, robust, and wide-open" debate on public issues. (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 270, 11 L. Ed. 2d 686, 701, 84 S. Ct. 710, 721.) Nevertheless, we do not think that anything in our decision today is inconsistent with this principle. While defendant CBS may have been justified in publicizing the existence of the death threat mailed to President Reagan and the fact that the Secret Service was investigating that letter, disclosure of the false and defamatory accusations made against plaintiff by the Browns is hardly essential to the story. That this is so is easily seen by reference to the 5 p.m. broadcast made

by CBS in which those accusations were not mentioned at all.

According to Robin Smith, the CBS reporter responsible for the stories, the decision to include the explicit accusations in the later broadcasts was an editorial one which she made. In so doing, Smith appears to have violated the standards for reporters established by CBS itself. At trial, Smith admitted to having stated in her deposition that she had been told at seminars conducted by CBS that reporters were not to broadcast accusations of crime in advance of an arrest or formal charge of the person who has been accused. She also acknowledged that, according to CBS news standards, reporters should refrain from "explicit fingering and identification of the alleged criminal by name" where a crime has been committed but there is "no warrant or arrest or indictment for any particular person." Despite these guidelines, and after only the most cursory investigation, and without any confirmation by the Secret Service itself, defendant CBS decided to broadcast the false and defamatory allegations against plaintiff to audiences which numbered over 800,000 persons. Following the CBS newscasts, which lasted no more than a few short minutes, the reputation which plaintiff had worked a lifetime to establish was ruined. Under these circumstances, we know of no constitutional doctrine or principle of law which would warrant protection of CBS from liability for its conduct.

 Finally, defendant CBS argues in the alternative that even if it was properly held liable, the amount of damages assessed against it was excessive and must be set aside. Where, as here, a private individual prevails on a defamation claim against a publisher or broadcaster based on negligence, as opposed to actual malice, the individual may recover compensation only for actual injury. (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 349, 41 L. Ed. 2d 789, 811, 94 S. Ct. 2997, 3012; *Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, 753, 415 N.E.2d 434, 448.) A majority of the members of the United States Supreme Court now seems to agree that a private individual may also recover punitive and presumed damages upon a showing of less than actual malice where the statements in question do not involve matters of public concern (*Dunn & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985), 472 U.S. 749, 86 L. Ed. 2d 593, 105 S. Ct. 2939), but neither party has urged the applicability of this rule to the case before us.

The actual damages which a private individual may recover are not limited to out-of-pocket loss. Compensation may also be awarded for impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. (*Newell v. Field Enter-*

*prises, Inc.* (1980), 91 Ill. App. 3d 735, 753, 415 N.E.2d 434, 448-49.) Awards must be supported by competent evidence concerning injury, although there need be no evidence which assigns an actual dollar value to the injury. (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 349, 41 L. Ed. 2d 789, 811, 94 S. Ct. 2997, 3012.) The amount of damages to be awarded is a question of fact. *Brown v. Farkas* (1986), 158 Ill. App. 3d 772, 779, 511 N.E.2d 1143, 1147.

We reviewed the facts of this case in some detail at the outset of this opinion. As that review disclosed, substantial evidence on the question of the actual damages sustained by plaintiff was presented to the jury. There is no dispute that the jury was properly instructed on the damages issue, and there is no indication that the jury's award was the result of passion or prejudice.

The verdict here was certainly substantial and is higher than typically seen in cases involving defamatory newspaper and magazine articles. As one Federal court has recently observed, however:

> "Television is a more intense and more focused medium. It allows the libeler to come into peoples' homes and deliver essentially in person a powerful libelous statement using various voice inflections to add power to the message. Television also allows for the use of graphics to emphasize the libelous material." (*Brown & Williamson Tobacco Corp. v. Jacobson* (7th Cir. 1987), 827 F.2d 1119, 1142.)

Moreover, the defamatory statements here were repeated via this "more intense and more broad medium" in two separate broadcasts which were viewed by a total viewership estimated to be in excess of 800,000 people. These factors were undoubtedly taken into account by the jury, and they distinguish this case from most of those upon which CBS relies.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

KARNS and WELCH, JJ., concur.