**Edgar ANDERSON, Plaintiff,**

v.

**HEWLETT–PACKARD
CORP., Defendant.**

**Civ. A. No. C86–3955.**

United States District Court,
N.D. Ohio, E.D.

Aug. 25, 1988.

As Corrected Sept. 2, 1988.

---

Tossie Wiley, Jr., Cleveland, Ohio, for plaintiff.

Barbara J. Leukart, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Dennis Gladwell Gibson, Dunn & Crutcher, Newport Beach, Cal., for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

On April 11, 1985, the plaintiff, Edgar Anderson, was fired by his employer, the Hewlett–Packard Corporation ("H–P"). He brings suit for breach of contract or, in the alternative, under a theory of promissory estoppel. Anderson previously voluntarily dismissed his claim under Title VII, 42 U.S.C. § 2000e et seq., for discrimination on account of race.

On July 25 and 26, the Court heard this case without a jury. Pursuant to Federal Rule of Civil Procedure 52, it now makes the following findings of fact and conclusions of law, and finds for defendant Hewlett–Packard.

### I

Anderson worked for H–P as a personnel supervisor in its Cleveland office. H–P fired Anderson on April 11, 1985. Anderson alleges that this firing violated his employment contract. He alleges that the H–P personnel and policy manual constituted an employee handbook and an employment contract. He also alleges that before he accepted employment at H–P, he was given oral assurances as to the reasons for which he could be fired, and the procedures that would be followed in the event that he was fired. Anderson argues, alternatively, that H–P is bound by the doctrine of promissory estoppel.

It is undisputed that, prior to his employment, Anderson was interviewed in H–P's office in Rolling Meadows, Illinois, near Chicago. Any promises which were made to him were made there. When he was hired, Anderson was told that he would eventually be transferred to either St. Louis or Cleveland. After he was hired, Anderson spent almost a full year at the Rolling Meadows office, being trained

for a position elsewhere. The Court determines that Illinois law is applicable.

■ The H–P guidelines on which Anderson relies were given to him in his capacity as a personnel supervisor. These guidelines are not distributed to employees, nor are they distributed to all managers. The testimony at trial was undisputed that only one copy existed in the Cleveland personnel office. The Court thus concludes that the H–P personnel and policy guidelines are not an employee handbook, and thus do not constitute an employment contract under Illinois law.

■ Anderson might, however, reasonably have relied on the guidelines. The guidelines, along with statements made to him by H–P employees, might form a basis for promissory estoppel. The Court does not reach this question, however, because it finds that under any set of promises that might have been made to Anderson, H–P was fully entitled to fire him in the manner in which it did.

## II

*Findings of Fact*

A. Anderson was graduated from West Point Academy in 1972, with a major in engineering. He then entered the Army, where he trained drill sergeants who, in turn, trained civilians to become soldiers. He left the Army in 1975, and was employed briefly by two engineering firms until 1979, when he went to graduate school at Yale. In 1981, he received a masters degree in public and private management from the Yale School of Management. In August 1981, H–P contacted Anderson to interview for a position as a personnel representative. He was flown to Rolling Meadows, where he met with Gloria Leffridge, an H–P personnel representative; Willard Harlow, the H–P personnel supervisor for the mid-west region; and three other H–P managers.

Leffridge spoke to Anderson about the "H–P way", a corporate philosophy which pervades H–P. The "H–P way" includes, for example, an undertaking by H–P to not lay-off any of its employees because of economic downturns, but rather to retrain them for employment elsewhere in the "H–P family". The philosophy also emphasizes that failures on the part of employees are viewed as management failures, and that a strenuous effort will be made to assist failing employees to become productive and to remain with H–P. Practices such as providing fruit, doughnuts, and coffee every morning at company expense, and putting all personnel on a "first-name" basis, are also part of the "H–P way."

Leffridge also spoke to Anderson about the procedures to be followed when employees were fired, and the reasons for which they could be terminated. Anderson was most interested in this, because he did not want to work in the personnel department of a company where he would be required to fire workers at the whim of their supervisors. Leffridge also told Anderson about the "deadly sins", set forth in Section 2 of H–P's personnel guidelines, *see infra* pp. 1296–97, and advised him that committing a deadly sin could result in a person being fired without any written or oral warning. The Court notes that one of the deadly sins is employee harassment.

After this set of interviews, Anderson was asked back for a second set. Eventually he was hired as a personnel representative. Harlow and Anderson had discussed salary and had agreed upon $30,000 per year. Although this was less than Anderson might have made in a large Wall Street firm in New York, it was more than any other H–P personnel representative was receiving at the time. Harlow testified that H–P saw Anderson as a promising manager.

Anderson moved to Rolling Meadows in October 1981, and began his training. It first consisted of a formal course, at which he was given, and studied, the personnel guidelines. Section 2 of the guidelines is entitled "Involuntary Termination" and states in relevant part:

2. INVOLUNTARY TERMINATION

    With the amount of discretion HP gives supervisors, no set of policies or guidelines will ever replace good judgment in making decisions. This is espe-

cially true in making decisions about involuntary termination, where there are many variables. With HP's basic belief in people, supervisors must strive to ensure that consistency and fairness are part of the decision-making process.

\* \* \* \* \* \*

Termination because of gross misconduct represents a difficult situation for both the supervisor and the employee. It is possible that the supervisor will have little warning or foreknowledge of the situation, and action may have to be taken quickly. The information in this section is also provided, therefore, to assist the supervisor who may be faced with the unpleasant duty of terminating an employee because of gross misconduct.

\* \* \* \* \* \*

## 2.2 GROSS MISCONDUCT

An employee engaged in willful, harmful acts involving the company may be required by the supervisor to leave the premises. The functional, personnel, and entity managers will review the circumstance(s) and determine whether termination is appropriate. *Willful, harmful acts which may be the basis for termination include, but are not limited to, the following:* theft or damage of HP property; unauthorized access of computer files; use, possession, sale, or dissemination of illegal drugs; being under the influence of alcohol or drugs; fighting; intimidation; insubordination; *and harassment. Written or verbal warnings are not required.* However, a written summary of the reason(s) for termination should be presented to the employee upon notification of termination.

(emphasis added).

Section 5 of the guidelines is entitled "Employee Harassment" and states, in relevant part:

## 5. EMPLOYEE HARASSMENT

Consistent with the company's fifth corporate objective, it is the policy of Hewlett–Packard Company to maintain a work environment free from all forms of harassment and to insist that all employees be treated with dignity, respect, and courtesy.

It is obvious from this company policy that any comments or conduct relating to a person's race, religion, age, or ethnic background which fail to respect the dignity and feelings of the individual are unacceptable. It should be equally obvious that this policy extends to comments or conduct of a sexual nature, where such behavior tends to threaten or offend a fellow employee.

Any behavior toward any employee by a manager, supervisor, or co-employee which constitutes unwelcome sexual advances, requests for sexual favors, or the display of derogatory posters, cartoons, or drawings, and other verbal or physical conduct of a sexual nature will be considered to be sexual harassment when:

(1) Submission to such conduct is made a condition of an individual's employment

(2) Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual

(3) *Such conduct has the purpose or effect of interfering with an individual's work performance or creating an unfriendly or offensive work environment.*

The company recognizes that employees of both sexes work together and communicate. Although there is no absolute definition of conduct which constitutes sexual harassment in every case, all HP employees are asked to conduct themselves reasonably in accordance with the guidelines set forth above. The company will not tolerate any conduct which fails to comply with the letter and spirit of these guidelines.

(emphasis added).

After the formal course, Anderson's training involved observing, and learning from, other personnel representatives' daily activities.

B. In June 1982, Anderson was transferred to Cleveland as a personnel representative. Harlow told Anderson that the Cleveland office was a difficult assignment: the sales people in the office were old fash-

ioned, and the office had some racial problems. Cleveland was also about to expand its operations, and this would involve additional work. In September, Anderson was promoted to senior personnel representative.

In November 1982, Anderson met Corlee Zakrajsek at a college bar. Zakrajsek was attending Baldwin–Wallace College at the time, and hoped to get a job in the personnel field; she had also just finished reading a case study of H–P in one of her classes and was very impressed with the company. Anderson and Zakrajsek talked and danced. He told her that she should apply for a position with H–P, and said that he had an employment application at his apartment. She went to his apartment with him, and after she filled out the forms, he made advances towards her. She rebuffed the advances and left.

Zakrajsek testified that she thought that that was the end of matters, and was surprised when Anderson called her two days later, apologized, and said that she should still apply for a position with H–P. However, the only opening available was a secretarial position. Not only did Zakrajsek not want a clerical position, but she was unqualified for it—she could not type. Anderson told her that the job involved much more than clerical work, and that once she was hired he could promote her from within; this would make both of them "look very good".

Anderson also made it clear to Zakrajsek that her advancement at H–P depended completely on him. Harlow, who was Anderson's supervisor when he moved to Cleveland, was not often in Cleveland, as he was based in Rolling Meadows. All personnel decisions in the Cleveland personnel office were, in reality, made by Anderson. As far as the typing went, Anderson said that the minimum was only 50 words per minute. When Zakrajsek told Anderson that she could not attain even that speed, he told her to lie on the application.

Zakrajsek had interviews with Anderson and with three other H–P personnel, and was hired. She began work December 6, 1982. She testified that she later saw her interview evaluations and that all three of the other interviewers thought she should not be hired because she was overqualified. Anderson also told her that the others felt this way. Zakrajsek made it clear to Anderson from the beginning that theirs was to be solely a professional relationship. At the beginning, he agreed.

Once Zakrajsek started working at H–P, Anderson frequently made inappropriate sexual advances towards her. One example is that Zakrajsek had a Christmas party to which she invited friends from H–P and friends from Baldwin–Wallace. After the party, at 2:30 in the morning, Anderson telephoned Zakrajsek and asked her to come to his apartment.

At work, Anderson would frequently make sexual remarks about Zakrajsek's "heavy" legs, which he liked. Anderson also knew that Zakrajsek had once dated a black man and told her "You know you want it, because you know the myth is true", assuming that she had slept with her boyfriend. Anderson also frequently telephoned Zakrajsek at home and invited himself over. Zakrajsek told him several times that this behavior had to end, and each time Anderson agreed, only later to begin all over again.

During the time Zakrajsek was working at H–P, Harlow came to Cleveland to investigate a complaint from a high school guidance counselor that Anderson was behaving inappropriately towards a high school girl working part-time at H–P. Before Harlow interviewed Zakrajsek, Anderson met with her. He told her that he would "kill her" if she told Harlow about his inappropriate behavior towards her. She said that she would not say anything if he would stop bothering her. He agreed, and Zakrajsek did not say anything to Harlow. Zakrajsek testified that she did this because she liked working with Anderson when he actually worked; he was good at his job and very smart. She also testified that, in retrospect, this "cover up" was the biggest mistake she had ever made in her life.

After the interview, not only did Anderson not keep his word, but things got worse. When Zakrajsek did not respond to Anderson's advances, he would turn on her, becoming very nasty. As the other witnesses made clear, this was Anderson's typical response to such rebuffs.

Zakrajsek asked for many internal transfers within H–P. She liked the company and wanted to stay, but she could not work with Anderson. One day Anderson told Zakrajsek that there was a position open in Pittsburgh, but that he did not recommend her for it. He added "You know why, don't you?" When she replied that she did not, he said "Because I see you here everyday and I cannot have you."

Zakrajsek testified that she could not go to Harlow to complain about Anderson because Anderson had told her that he was "in like Flynn" with Harlow, and had him "wrapped around his finger". Moreover, since she had not told Harlow the truth about Anderson's behavior towards her when he came to Cleveland to investigate the allegations of Anderson's inappropriate behavior towards the high school girl, she believed that she would have no credibility if she said anything now.

One day in February 1984, Zakrajsek simply quit; she gave no notice. Anderson asked her back, but she refused. She agreed that she would not register any complaints with H–P as to her real reason for quitting; in turn, Anderson promised that he would make sure that she received unemployment compensation and good references from H–P. However, Anderson lied on her H–P termination form by stating that she was fired because she was not qualified, and Zakrajsek testified that Anderson also told potential employers that she was not re-hireable.

Zakrajsek testified that the entire episode with H–P was a major setback in her personal and professional life. She was not able to find another job in the personnel field, and moved to Chicago where she studied for, and became, a paralegal, working as such for a year in the law firm of Kirkland & Ellis. She eventually moved back to Cleveland, and at the time of trial, believed she was beginning to "put her life back together". She testified that she felt guilty about "covering" for Anderson and that, if she had the choice again, she would tell Harlow everything.

This Court finds Zakrajsek to be a totally credible witness. The Court accepts all of her testimony about Anderson and her employment at H–P.

C. On March 19, 1984, Anderson hired Barbara Munley as a personnel representative for the Cleveland office. Munley was graduated from Cleveland State University in 1974 with a major in psychology. After graduation, she worked for Gray Drug Stores as a psychological stress interviewer. At Gray Drug, she was promoted to supervisor of her unit, in charge of five other interviewers.

Munley left Gray Drug after three and a half years when it closed the department. She then went to a subsidiary of Harcourt Brace Jovandvich ("Harcourt"), where she started as an employment specialist. At Harcourt, Munley was promoted to employee relations manager, where she was in charge of all grievances and developed employee policies for the company.

Munley next went to the Diamond Shamrock Corporation, as a human resources representative, where she was responsible for 500 employees. She was promoted to human resource supervisor and moved to New Jersey. After leaving Diamond Shamrock, she spent a short time at a savings and loan institution as an employee relations manager, and then joined H–P. Munley testified that she came to H–P because she had been working in an industry that was declining, and thought that there were better opportunities for her at H–P, which was expanding and which had a reputation for being a fine employer.

On her first day at H–P, Anderson introduced her to her new colleagues. Munley heard remarks such as "Are you a replacement for Zakrajsek?" "What do we need another one of you [a person like Anderson] for?" and "Is she another one of your [Anderson's] mistresses?".

The personnel job at H–P involved using computers. Munley was unfamiliar with computers and often worked late to learn how to use them. During these times, and others, Anderson often touched her and brushed up against her. Munley at first thought that it might just be her imagination, or that she had to adjust to H–P's first-name, "friendliness" ways, which were different from those in any of her previous employment experiences.

Anderson also made comments about black men and white women such as "What do you think about Michael Jackson and Brooks Shields?" and "What would your 'momma' say if I were to come home with you?". Munley considered herself a professional and thought that she could handle the situation. She told Anderson that she did not like him coming up to her and brushing up against her, and that the comments were inappropriate.

Two male H–P employees with whom Anderson had become friendly would often come to his office at 5 p.m. and drink beer, apparently a not unusual end-of-the-day occurrence at H–P. While the three men drank, they made crude gestures and sexual comments. For example, one of these two friends had recently married and remarked that he was going to "go home and do it"; he then asked Anderson "What are you going to do tonight?" Anderson replied by making gestures like he was masturbating, and one of the two friends said "Yea, shoot it all the way to the ceiling." As the office area was open, Munley could not help but hear everything that they said. Munley told Anderson that she did not appreciate that type of talk, and he said that he would stop. After that, Anderson stopped speaking to Munley altogether; however, the incidents did not occur as frequently.

Other incidents occurred as Munley continued at H–P. During office hours, Anderson would often walk up behind Munley and get so close that they were almost touching. One night Anderson and Munley were at dinner with Andy Linfaeger, a headhunter who helped H–P find potential employees. Anderson spoke at dinner about his sexual conquests of white women. After dinner, he helped Munley on with her coat and let his hands linger on her shoulders.

When Munley was first hired, she was told that it would be for only six months, and that after that she would be transferred to either Cincinnati or Pittsburgh. When the position in Cincinnati opened up, Anderson advised Harlow against transferring her. He told Harlow that he did not think she was "ready for" the job.

Munley felt that she was now "trapped" with Anderson indefinitely, and could not leave. Because H–P had such a good reputation, other employers would wonder why she had left; they were not likely to believe that Anderson was harassing her and yet H–P did not correct the situation. Munley believed that if she left H–P it would be very difficult to find other employment, as potential employers would assume that there was something wrong with her.

After Munley did not receive the transfer position, things got worse. Anderson often got very angry with her, and would not respond to work-related questions, when asked. Anderson seldom spoke to her, and when he did, he "barked." Things continued this way until Anderson was fired.

D. Kathy Mihaloew began working at H–P on January 2, 1985, as a clerical employee. She was a young married woman, the mother of an infant daughter. Anderson was her immediate supervisor.

One time when Mihaloew and Anderson were looking through a file cabinet for applicants for a particular position, Anderson made sexual jokes about the names of some of the women. For example, a woman who was named Cleavinger, Anderson called Cleavage. These are typical of comments made by adolescent boys in junior high school. When applicants came to interview, Anderson would comment on their appearance, saying "nice ass", and "bet she's good". Anderson once changed a number on a form Mihaloew was working on to "69" and made a sexual comment. Another time he saw the figure "12", and asked Mihaloew if she had "ever done it twelve times." Anderson also once

complimented Mihaloew on her blouse and touched it, which made Mihaloew very uncomfortable.

Anderson often went to lunch with Mihaloew and Annette Doster, another clerical worker in the personnel section. Once someone spilled white clam chowder on the tablecloth and Anderson remarked "You know what that looks like, don't you?" The women found this inappropriate and crude. At that lunch, he also touched Mihaloew on the elbow; she testified that his actions conveyed the impression that he wanted events to lead to more than just lunch. Anderson also told Mihaloew and Doster that he had made love to a woman five times in one day.

Mihaloew was ready to quit her job at H–P, even though she liked the work, except for Anderson. Using H–P's "open door" policy, she told Doug Moore, another H–P manager, about Anderson's behavior. The meeting took place one morning, and lasted three hours. Moore told his superior, and either the supervisor or Moore then spoke to Harlow. Harlow got back in touch with Mihaloew, who told him what she had told Moore about Anderson. Harlow then decided to come to Cleveland to investigate, but could not get there for a week. He asked Mihaloew to write down what she had told him.

E. Annette Doster began working at H–P in 1983, when she was 19. One of Doster's duties was to send Anderson's expense reports into the main office. On one occasion, she noticed that one of his reports stated that she had had lunch with him when she had not. Doster told this to Anderson, but he ignored her. From then on, however, he filled out his own reports. Anderson admitted at trial to falsifying these reports. The Court notes that this action, alone, is sufficient reason for Anderson to be fired for gross misconduct.

Doster confirmed Mihaloew's testimony that Anderson made sexual comments about applicants who came into the office for interviews. In fact, she stated that Anderson made sexual comments about every woman who came into the office. When Munley first began working at H–P,

Anderson remarked that "she ha[d] a nice ass." In restaurants, he made sexual comments about the waitresses. In sum, it appears that Anderson made inappropriate sexual comments about every woman who came into view.

One Christmas, Anderson learned that Doster's family was leaving town and that she would be home alone for her vacation. Anderson said "Maybe I'll come over and visit", and pinched her. Doster told Anderson "no".

When any of the women rebuffed Anderson's advances, he would punish her by ignoring her and by otherwise making her life difficult. Doster testified that this happened to her whenever she would tell Anderson "no". Doster felt confused and scared; she did not know to whom at H–P she could go. She felt that because she was only working part-time; was in or just out of high school (depending on the time of any particular incident); had just started working at H–P; and Anderson was her supervisor and seemed well respected, that there was no one to whom she could turn for help.

F. Willard Harlow, based in Rolling Meadows, was the H–P supervisor for personnel in charge of the entire mid-west region. Munley had complained before March 1984 about her relationship with Anderson, but had never specifically mentioned harassment. He testified that, in retrospect, he should have "read between the lines". However, at the time Munley first complained, Harlow had complete faith and trust in Anderson, and believed that, as his manager, he had to support Anderson.

On approximately March 12, 1985, Doug Moore was in Rolling Meadows for a meeting and contacted Harlow. He told him that there was a problem in personnel in Cleveland, and that he should contact Mihaloew. He told Harlow that Mihaloew had used H–P's "open door" policy to tell him of the harassment, and of other problems. These other problems included Anderson's constant tardiness, his being away from the office without anyone knowing where he was, and rumors of drug abuse. These incidents were recounted at trial, but are

omitted from the Court's findings of fact as unnecessary to its determination in this matter.

Harlow called Mihaloew, who then told him what she had told Moore. Harlow told her to put what she had said in writing, and that he would come to Cleveland as soon as he could, most likely in a week, as he had another trip he had to make before then. When he returned to Chicago after his other trip and before going to Cleveland, he found the second letter from Munley, recounting her first year's experience at H–P. In this letter, Munley for the first time told Harlow of the sexual harassment and plain harassment she had been subjected to by Anderson. She wrote that when she had spoken to Harlow in person earlier, she had "soft-pedaled" her comments, and had hoped that he would "read between the lines."

At this point, Harlow decided that Anderson was clearly behaving improperly in running the Cleveland personnel department. Harlow testified, though, that he did not realize that the situation was as bad as he eventually found it to be. Harlow spoke to the legal department at H–P, as well as to his supervisor, Bob Rogers, regarding Anderson. Rogers agreed that it was appropriate to suspend Anderson from his duties as a supervisor until an investigation could be completed.

Harlow came to Cleveland on either March 28 or 29, 1985, and met Anderson that morning at Harlow's hotel. He told Anderson that he was being suspended and that he would report to Mike Nichols for the time being. Harlow told Anderson that he was removing him because he was not getting his work done; he also told Anderson that he should not return to the office that day, and that he would speak to him later. It was standard policy at H–P to suspend a person from their job, with pay, while an investigation took place.

Harlow then went into the Cleveland office. He met with Munley, Mihaloew and Doster together and told them that Anderson was suspended. He received what he characterized as "an almost hysterical reaction", in that none of the women

wanted to work for H–P in Cleveland unless Anderson was terminated. Harlow replied that on the basis of the information he had, firing was unwarranted. Harlow then met with each one of the women separately.

Harlow spoke to Mihaloew first. She repeated what she had written in her letter, and was very emotional and in tears. He then spoke to Doster. Until then, he had heard nothing from her, but she now told him of Anderson's harassment and other actions. The third person he spoke to was Munley. Munley would not even meet with him unless another person was present. She wanted Doug Moore to be there, and Harlow agreed. Again, Munley was very general in her criticism of Anderson, mostly focusing on what she thought were problems in his management of the office. Upon Harlow's insistence, Munley finally related the specifics of Anderson's sexual harassment. Harlow then spoke to the other managers at the Cleveland office, who said that they had no problems with the personnel office. They also said that they had heard rumors about Anderson, but had no direct knowledge of his activities.

Harlow spoke to Anderson that night, telling him that his credibility was in trouble, and that he was unsure whether he could continue in the Cleveland office. Harlow told Anderson that he should stay out of the office until the investigation was completed.

Harlow met with Anderson personally on Wednesday of the next week. Anderson requested that another person be present, and asked for Rose Conley. Harlow agreed. At this meeting, Harlow read a list of allegations against Anderson, including those relating to sexual harassment, and Harlow's conclusions, and asked him to respond. Anderson denied all of the allegations and was "flabbergasted" that they had been made. Anderson complained that Harlow had not complied with the H–P process. Harlow told Anderson that he was sorry that he felt that way, and asked what would he like him to do. Harlow told Anderson that he would send him a written copy of the charges that he had orally

outlined that day. Anderson told Harlow that he would like an opportunity to respond. Soon after the meeting, Anderson left Cleveland to visit Chicago. Harlow sent him the letter, which Anderson did not receive until sometime in early April.

Harlow then tried to find Zakrajsek. He remembered that she had left with no notice, and the strange circumstances had always bothered him. He finally spoke to Zakrajsek on April 10, and she recounted the facts set forth above, although not in as much detail. Until then, Harlow had been wondering whether the three women in Cleveland were somehow conspiring against Anderson, but he was now certain that they were telling the truth.

Harlow again spoke to his supervisor, Bob Rogers, to his group manager, and to H–P legal counsel. He told Rogers that he had no choice but to fire Anderson, and Rogers agreed. On April 11, Harlow met with Anderson, and fired him for gross misconduct. Harlow either read or paraphrased a very short letter which he then gave to Anderson. Anderson had no questions, and Harlow left the room. Bobbi Starzec then conducted Anderson's exit interview.

Harlow testified that this was the most difficult decision he had ever made; he did not sleep for nights before making it. He felt deceived and let down by Anderson. On the other hand, Harlow believed that Anderson had obviously "mistreated" his employees, and this could not be tolerated.

### III

The Court finds the defendant's witnesses totally credible. In particular, the Court fully believes that the examples of harassment to which these witnesses testified actually occurred. The Court finds Anderson much less credible, believing only parts of his testimony about his meetings with Harlow.

Anderson tried to discredit H–P's witnesses by asking each of them specifically whether Anderson had ever "propositioned" them to sleep with him. Munley and Mihaloew each said no. Doster stated that Anderson had never directly proposi-

tioned her, but had indirectly done so several times. It is obvious from Zakrajsek's testimony that Anderson did, in fact, ask her to sleep with him. In any event, all of this is irrelevant.

A supervisor need not ask a person to sleep with him or her in order for the supervisor's conduct to rise to the level of sexual harassment. The Court notes what must be an obvious fact: very few men or women simply out of the blue ask members of the opposite (or same) sex to sleep with them; they first test the waters, as it were, to see what type of response they will likely elicit. This is precisely what Anderson did, starting with provocative touches and remarks to see who might favorably respond. So while Anderson did not explicitly ask all of these women to sleep with him, he made his intentions clear.

However, asking an employee to sleep with one is not a necessary predicate for sexual harassment. H–P's guidebook explicitly states that "[s]uch conduct [that] has the purpose or effect of interfering with an individual's work performance or creating an unfriendly or offensive work environment" is a violation of H–P policy. A recent Supreme Court case is in accord. In *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49, the Court held that sexual harassment which creates a hostile or offensive work environment violates Title VII, 42 U.S.C. § 2000e. *Id.* 106 S.Ct. at 2406 (citing *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982)).

It is clear to the Court that Anderson's constant sexual remarks, innuendos, insinuations and suggestions made life completely unbearable for the women working for him, as did the childish punishments he inflicted upon them when they would not accede to his demands. One employee, Zakrajsek, quit H–P because of the harassment; and two, Munley and Mihaloew, were about to. Anderson also conditioned these women's employment on having sexual relations with him. He explicitly told Zakrajsek that he did not recommend her for a promotion to the Pittsburgh office

because he could not "have her", and the Court concludes that this was also his reason for not recommending Munley for the transfer to Cincinnati. Even if in his own mind Anderson did not link the spurning of his advances to his poor evaluations of these women (although the Court finds this unlikely), the Court notes as well that intent on Anderson's part is unnecessary. Anderson's actions towards the women after they refused his advances clearly made their professional advancement impossible.

It should be clear to corporate America, by now, that the law does not tolerate the type of behavior Anderson exhibited. The termination of employees who behave as Anderson did is justified and lawful. In fact, the only troublesome part of this case is that it took H–P as long as it did to fire Anderson. Harlow testified that he was unsure whether Munley, Mihaloew and Doster were telling the truth until he spoke to Zakrajsek and she told him of yet more incidents. While it is laudable to hesitate to fire an employee because of fears that others have conspired against him, Harlow's delayed reactions strike the Court more as the product of old-fashioned thinking that, all in all, "boys will be boys", "women are too emotional and exaggerate things", and "if you can't stand the heat, get out of the kitchen." Harlow seemed more concerned that Anderson might not be at his desk when needed than that he might be making unwanted and unlawful overtures towards his female subordinates. And his failure to "read between the lines" of Munley's complaints, while unintentional, bodes ill for a regional manager in charge of personnel.

## IV

This Court unhesitatingly concludes that Anderson's actions not only violated H–P's guidelines and policies, but were more than likely illegal under federal law, had any of H–P's women witnesses chosen to exercise their rights against Anderson and H–P. H–P's guidelines explicitly state that anyone who harasses other employees can be fired without written or oral warning. Anderson was also told this by Leffridge during his initial interview. He could thus expect nothing other than termination if he harassed his employees. Because the Court finds that he did, the Court need not reach the question of whether there was any type of employment contract here, or whether H–P is bound by the doctrine of promissory estoppel. Even if there were, H–P did not violate any of its terms or break any of its promises—the most it promised Anderson was that if he harassed one of H–P's employees, H–P could, and would, fire him without warning.

The Court therefore finds for the defendant Hewlett Packard Corporation, and dismisses Anderson's complaint.

IT IS SO ORDERED.