Robert De BONO, Plaintiff,

v.

**CHICAGO SUN–TIMES, INC., a Delaware corporation, Defendant.**

No. 87 C 2949.

United States District Court, N.D. Illinois, E.D.

Feb. 16, 1989.

Harvey Sussman, Sussman & Hetzberg, Chicago, Ill., for plaintiff.

John G. Levi, Samuel K. Skinner, Glenn D. Newman, Linzey D. Jones, Sidley & Austin, Chicago, Ill., for defendant.

## ORDER

NORGLE, District Judge.

Before the court are cross-motions for summary judgment, *see* Fed.R.Civ.P. 56(a), (b), and defendant's motion for judgment on the pleadings. *See* Fed.R.Civ.P. 12(c). For the following reasons, defendant's motions are granted, and plaintiff's motion is denied.

## UNDISPUTED FACTS

In his statement of undisputed facts, *see* local Court Rule 12(f), plaintiff fails to contest any of the undisputed facts recited by defendant in its statement of undisputed facts. *See* local Court Rule 12(e). Rather, plaintiff states two legal conclusions, makes two factual allegations, the substance of which were stricken by previous order of the court, *DeBono v. Chicago Sun–Times*, No. 87 C 2949 (N.D.Ill. July 8, 1988), and provides no reference to any evidence. Therefore, the following facts, as alleged by defendant, are undisputed.

Plaintiff, Robert DeBono, was hired as Vice President of Circulation for the Chicago Sun–Times, Inc. ("Sun–Times") on September 15, 1986. At the time of his hiring, plaintiff and the Sun–Times entered into an employment contract, setting forth the terms and conditions of his employment. Deposition of Plaintiff ("Pl. Dep.") at 162–163. Section 3.02(b) of the contract sets forth the grounds for which plaintiff could be discharged from his employment. Section 3.02(b) states in full:

(b) *"For Cause"* means inadequate or improper performance of the duties assigned pursuant to Article I, acts of misconduct or dishonesty, activities harmful to the reputation of the Sun–Times, violation of any statutory or common law duty of loyalty to the Sun–Times, material breach of this Agreement, or any other similar circumstance, as reasonably

determined by the President and Publisher and Executive Vice–President of the Sun–Times.

As Vice President of Circulation, plaintiff was responsible for the Sun–Times' Circulation Department and all its operations. Pl.Dep. at 184–185. Plaintiff was also a member of the Sun–Times senior management team and a member of its eight member management committee. Deposition of Donald F. Piazza ("Piazza Dep.") at 40–41.

Within ten days of being hired by the Sun–Times, plaintiff asked Donald F. Piazza, Executive Vice President of the Sun–Times, if he could borrow $14,000 from the Sun–Times so that he could exercise stock options from his former employer. Plaintiff told Piazza that he would repay the loan out of the proceeds of the stock sale immediately after he exercised his options. Piazza told plaintiff that the Sun–Times did not ordinarily make such loans, but that he would arrange for the loan so that plaintiff would not lose the profits from exercising his stock options. Plaintiff obtained the $14,000 loan on September 25, 1986, and executed a secured promissory note for $14,000 in favor of the Sun–Times (the "14,000 Note"). Pl.Dep. at 165–171; Piazza Dep. at 28–30. The Note became due and payable in full on October 15, 1986, and was secured by 600 shares of Knight Ridder stock, owned by plaintiff. With the proceeds of the Sun–Times's loan, plaintiff exercised his options and then immediately sold the stock for a profit. Pl.Dep. at 168, 173.

Plaintiff did not repay the loan out of the proceeds of the stock sale as the parties had agreed. In the first week of November, 1986, Piazza reminded plaintiff that he had not repaid the Note when it became due on October 15, 1986. Plaintiff told Piazza that he would repay the Sun–Times in about a week. On December 3, 1986, after not hearing from plaintiff concerning the loan for four weeks, Piazza again reminded plaintiff of his obligation to repay the loan. Plaintiff again told Piazza that he did not have the money but that he would tell him on December 5, 1986, exactly when he would be able to pay. On December 5, 1986, plaintiff told Piazza that he would repay the loan on December 19, 1986. The above described events are summarized in a memorandum from Piazza to plaintiff's file. Plaintiff testified to the accuracy of that memorandum. Pl.Dep. at 173. Contrary to plaintiff's understanding with the Sun–Times and the express provisions of the Note, plaintiff has refused to repay any portion of the Note despite repeated requests by the Sun–Times. Pl. Dep. at 172. To this day, the $14,000 Note remains unpaid. Pl.Dep. at 172.

In late September, 1986, after plaintiff had been employed by the Sun–Times for less than three weeks, plaintiff approached Nicholas Manzie, the City Home Delivery Manager for the Sun–Times and plaintiff's direct subordinate, and requested a $3,500 loan from him. Pl.Dep. at 198; Deposition of Nicholas A. Manzie ("Manzie Dep.") at 24–25. After knowing Manzie for less than three weeks, Pl.Dep. at 200, plaintiff called Manzie into his office, during the work day, and told him that he needed $3,500 because he "had to pay some bills or send some money to my brother...." Pl.Dep. at 199; Manzie Dep. at 23–25. Manzie told plaintiff that he would try to obtain the money for him. Manzie Dep. at 25. Manzie stated that he could raise the money by going "out on the street," meaning that he would borrow the money and lend it to plaintiff. Manzie Dep. at 25–26. Manzie raised the the $3,500, Manzie Dep. at 25–26, and lent plaintiff $3,500 in plaintiff's office shortly after plaintiff requested the loan. Manzie Dep. at 26; Pl. Dep at 200–201.

Plaintiff told Manzie that he would be able to repay the loan the following week but gave Manzie a $3,500 check postdated to October 7, 1986, in order to insure that plaintiff had enough time to obtain sufficient funds to repay the money. Manzie Dep. at 27; Pl.Dep. at 198–199. Plaintiff told Manzie that he could cash the check on October 7, 1986. Pl.Dep. at 202; Manzie Dep. at 27.

On October 7, 1986, plaintiff spoke with Manzie in plaintiff's office and told Manzie not to cash the check because he did not have enough money. Plaintiff asked Man-

zie for additional time in which to repay the loan. Manzie Dep. at 28; Pl.Dep. at 202. Manzie had several conversations with plaintiff about repaying the loan. Manzie Dep. at 32. As plaintiff's subordinate, Manzie was "very concerned" that "bothering" plaintiff about the loan would affect his position at the Sun–Times. Manzie Dep. at 35. As he testified:

A. Well, he is my boss. He is the vice president of circulation. I don't want to prod him or, you know, close in on him and make him think that, you know, I was twisting his arm, putting me in bad favor of him.

Q. Do you have any reason to believe that he would do anything like that if you raised the issue of 3500 bucks being paid back?

A. It's a lot of money. I didn't know him that well, and I had no reason not to believe him that that would not happen.

Manzie Dep. at 30. Nevertheless, in December, 1986, Manzie went to plaintiff's office and again asked plaintiff to repay the loan. Manzie told plaintiff that he really needed the money. Manzie Dep. at 34; Pl.Dep. at 204. Plaintiff told Manzie that he did not have the money, but that he would be able to repay Manzie as soon as he sold his mother's house. Pl.Dep. at 204–205; Manzie Dep. at 35. Plaintiff, however, did not repay Manzie after he sold his mother's house. Pl.Dep. at 205. To this day, plaintiff has not repaid any portion of the $3,500 loan. Manzie Dep. at 45.

In early February, 1987, Manzie told Piazza that plaintiff had asked him for a $3,500 loan after plaintiff had started working for the Sun–Times, that the loan had been made, and that plaintiff had refused to repay Manzie despite numerous requests. Piazza Dep. at 37; Manzie Dep. at 38–39. When Piazza heard about plaintiff's loan from Manzie, Piazza concluded that plaintiff "had compromised his ability to supervise that employee who was his right-hand man [because he] lost all his leverage over Nick Manzie." Piazza Dep. at 37. As Piazza testified:

[I]t was very important for each person who participated in [the management committee] to be trusted and to have integrity. That was tarnished when [Plaintiff] did not pay the $14,000 loan, and it became untenable when he didn't repay the $3500—I shouldn't say repaid —borrowed in the first place, the $3500 from Nick Manzie.

And Nick Manzie was obviously troubled, and, I think it's fair to say that the relationship between Nick Manzie and [Plaintiff] was impaired by the virtue of not only having made the loan but then compounding that error by not repaying the loan subsequent.

Piazza Dep. at 41. Piazza discussed plaintiff's actions with Robert E. Page, President and Publisher of the Sun–Times, and Charles Price, Senior Vice President and General Counsel, and they each agreed that plaintiff should be terminated. Piazza Dep. at 42.

On February 5, 1987, plaintiff met with Piazza and Price in Piazza's office. Pl.Dep. at 551. Plaintiff testified that at the meeting, Piazza was upset about the Manzie loan and told him:

You borrowed from an employee . . ., and the poor guy wanted it back and asked you for it, and you didn't repay him. . . .

Pl.Dep. at 556. Plaintiff testified that Piazza told him that he could have been discharged solely for borrowing money from a subordinate. Pl.Dep. at 552. Plaintiff further testified that Price told him, "that borrowing from a subordinate—that I should known better, and how do I expect to discipline a subordinate." Pl.Dep. at 552–553. Plaintiff further testified that Piazza told plaintiff:

that I had not been performing well because circulation wasn't up . . . he said he did not think that I had a grasp of the procedures and the activities at the Sun–Times.

And, in addition to that, I had not repaid the company loan that had been given to me, despite my telling him twice that I would repay it in the near future, and he said that I did not even talk with him about it or tell him that I was not

going to be able to make a payment at one time.

Pl.Dep. at 551–552. At this meeting, Piazza told plaintiff that he would have to terminate his employment but gave him the option to resign. Pl.Dep. at 554. Plaintiff refused to resign, and was terminated as of February 5, 1987.

Plaintiff admits that he has not repaid any portion of the $14,000 loan and that he is liable to the Sun–Times for $14,000 plus all costs and expenses including, without limitation, court costs and expenses and attorneys' and paralegals' fees incurred by the Sun–Times with respect to the enforcement, collection, or protection of its rights under that Note. Plaintiff also admits that he borrowed $3,500 from Manzie and that he has not repaid any portion of that loan. Plaintiff further admits that Manzie's rights under the oral loan agreement with plaintiff have been duly assigned to the Sun–Times and that plaintiff is liable to the Sun–Times for the sum of $3,500 with interest from October 7, 1987. Plaintiff's Answer to the Sun–Times' First Amended Counterclaim.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242–248, 106 S.Ct. 2505–2510, 91 L.Ed.2d 202 (1986). A plaintiff cannot rest on mere allegations of a claim without any significant probative evidence which supports his complaint. *Id.; see First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported

claims and defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Accordingly, the nonmoving party is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories and admissions on file to designate specific facts showing a genuine issue for trial. *Id.*

The Employment Contract in this case allows for termination of the contract for cause. "For Cause" is defined in the contract as including "improper performance ... or ... acts of misconduct ... as reasonably determined by the President and Publisher and Executive Vice–President of the Sun–Times." Interpretation of the Employment Contract is to be governed by Illinois law, according to the choice of law provision in the contract. "Illinois courts treat the meaning of an unambiguous contract as a question of law." *Newman–Green, Inc. v. Alfonzo–Larrain R.*, 605 F.Supp. 793, 797 (N.D.Ill.1985). Here, the meaning of the "For Cause" provision of the Employment Contract is clear and unambiguous. Thus, if any reasonable jury would find that the persons authorized in the Contract made a reasonable finding that plaintiff performed improperly or committed acts of misconduct, defendant is entitled to summary judgment. *See S.J. Groves & Sons v. International Brotherhood of Teamsters*, 581 F.2d 1241, 1244 (7th Cir.1978) ("disputes over interpretations of 'just cause' provisions are resolvable by summary judgment where there is no genuine issue of material fact").

Defendant asserts three grounds for cause for terminating plaintiff: the $14,000 loan and surrounding circumstances, the $3,500 loan and surrounding circumstances, and plaintiff's job performance aside from his financial misconduct. Defendant essentially admits that genuine issues exist concerning this last ground. However, the court finds that, as a matter of law, each of the two grounds for financial misconduct is independently sufficient to support dismissal for cause, as defined in the Employment Contract.

Plaintiff's borrowing of $14,000 is not itself grounds for termination, since the Sun–Times agreed to make the loan. How-

ever, plaintiff's refusal to repay the loan was misconduct. Furthermore, plaintiff's repeated misleading of the Executive Vice President about when repayment would occur was also improper. The most glaring example of this was plaintiff's promise to repay the loan using proceeds from the exercise of his stock option (the primary reason the Sun–Times agreed to extend the loan), and subsequent failure to use *any* of those proceeds toward repayment. All this is misconduct for any employee. It is all the more improper when committed by an officer, fiduciary, and member of the management committee. No reasonable jury could deny that a reasonable person could find this conduct to be improper.

Plaintiff argues that defendant's only stated reason for terminating plaintiff was the $3,500 loan, and therefore, the $14,000 loan should not be considered. However, plaintiff's "evidence" that the $14,000 loan was not part of the decision to terminate plaintiff is a misreading of deposition testimony; at his deposition, Piazza, when asked about the "triggering event" for terminating plaintiff, and whether it was "just the Manzie loan," states: "I was very disappointed about the other loan as well because I think that the fact that he misled me in the beginning and strung me along later is a commentary on his integrity." Piazza Dep. at 45. Plaintiff further argues that defendant terminated plaintiff for the ulterior motive of making room to hire someone else. The only "evidence" to support this allegation is a hearsay statement rebutted by other testimony. Moreover, whether defendant stated that the $14,000 loan was a reason for termination, and whether the $14,000 loan actually was a reason are not relevant issues:

> [T]he party terminating a contract may assert any grounds justifying termination, whether or not it announced those grounds at the time of termination; the Court does not inquire whether those grounds actually motivated the party to terminate the contract.

*First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 591 F.Supp. 812, 820 (N.D.Ill.1984); *aff'd*, 766 F.2d 1007 (7th Cir. 1985) *citing, Sterling Emery Wheel Co. v. Magee*, 40 Ill.App. 340, 343 (1891).

Plaintiff's borrowing of $3,500 from his subordinate was also cause for termination. A reasonable employer could decide that the very request for the loan is misconduct. Borrowing money from a subordinate could compromise one's ability to carry out his duties by interfering with his ability to supervise and/or discipline the subordinate. *See H. Vincent Allen & Associates v. Weis*, 63 Ill.App.3d 285, 19 Ill.Dec. 893, 900, 379 N.E.2d 765, 772 (1978) ("It is sufficient for the employer to show that the employee was guilty of a default in duty whose natural tendency was to injure his business, and actual injury hereto need not be shown.") Furthermore, plaintiff's failure to keep his promise to repay Manzie by the following week, his subsequent failure to repay Manzie after Manzie stated that he really needed the money, and his failure to use *any* of the proceeds of the sale of his mother's house to repay Manzie clearly could be determined to be "misconduct." Such conduct could be perceived by employees as a manager taking advantage of his position to "shake down" employees; that perception could hurt employee morale generally, and particularly in the area of plaintiff's control. Also, the employer could legitimately be concerned about a manager taking advantage of his position, considering such conduct to be improper because it is unfair. Finally, the "natural tendency" of plaintiff's continued failure to repay is to further damage his ability to effectively supervise Manzie even if, as plaintiff argues (and defendant disputes), no actual damage occurred. *See id.*

Plaintiff argues that the loan from Manzie was out of friendship. Yet, all the evidence indicates the contrary. Plaintiff first met Manzie upon becoming his superior at work, just a few weeks before requesting the loan, and the loan was made at work. Plaintiff argues that the "friendship" is indicated by the facts that plaintiff worked with Manzie on numerous on-the-job projects, that plaintiff utilized Manzie's input, that Manzie helped plaintiff find an apartment, and that Manzie helped plaintiff obtain used furniture. The first two facts merely evidence a working relationship, and the last two are further evidence of plaintiff's enlisting a subordinate's help

with his personal life. When asked whether he developed a personal friendship with plaintiff, Manzie testified:

> No, we were just, you know, he was my boss. He was my boss and that was ... the extent of my friendship with him. He was the vice president of the circulation department, and I was just as friendly as I had to be to maintain.

Even if plaintiff and Manzie were friends, Manzie's deposition clearly reveals that despite his need for repayment, he was afraid to push for repayment because plaintiff was Manzie's boss. An employer could reasonably find borrowing from a subordinate and failing to repay the loan to be misconduct even if the subordinate were a friend of the borrower.

Plaintiff argues at length that he performed his other duties well. Even if true, this is irrelevant. The Employment Contract does not require that *all* the employee's conduct be improper for termination. If any of the employee's conduct is improper, sufficient ground for termination exists. Here, two independent grounds for termination existed at the time plaintiff was terminated.

Regarding defendant's Motion for Judgment on the Pleadings, defendant's First Amended Counterclaim contains two counts. Count I is for the $14,000 Note, with interest, reasonable attorneys' fees, paralegals' fees, costs, and expenses incurred in suit on the Note, and Count II is for the $3,500 Note, with interest. Plaintiff admits every allegation in the First Amended Counterclaim, and fails to respond to defendant's Motion for Judgment on the Pleadings. Consequently, defendant's motion is granted.

In sum, defendant's motion for summary judgment against plaintiff's claim is granted, defendant's motion for judgment on the pleadings on defendant's First Amended Counterclaim is granted, and plaintiff's motion for summary judgment is denied.

IT IS SO ORDERED.