**Claus D. SCHERER, Plaintiff,**

v.

**ROCKWELL INTERNATIONAL CORPORATION, Defendant.**

No. 89 C 6833.

United States District Court, N.D. Illinois, E.D.

May 3, 1991.

Stephen P. Carponelli and James V. Noonan, Carponelli & Krug, Chicago, Ill., for plaintiff.

Richard H. Schnadig and Bruce R. Alper, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendant.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, District Judge.

Claus Scherer ("Scherer") has sued his former employer Rockwell International Corporation ("Rockwell") for a declaratory judgment finding a post-employment restrictive covenant invalid or unenforceable (Count I), as well as asserting two claims based on the circumstances surrounding his termination from Rockwell: one for breach of contract (Count II) and the other for defamation (Count III). Both parties now move for summary judgment under Fed.R.Civ.P. ("Rule") 56.[1] For the reasons stated in this memorandum opinion and order, Rockwell's motion is granted in its entirety, while Scherer's motion is denied in full.

### Facts

For many years (beginning in 1965) Scherer was employed in the commercial

---

1. Where as here cross-motions for summary judgment are involved—in this instance in the form of two separately briefed motions on the same counts—this Court is in the Janus-like position of having to draw all reasonable inferences in favor of each nonmovant—Scherer on Rockwell's motion and Rockwell on Scherer's motion (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991)). Both sides have tendered statements in support of their respective Rule 56 motions according to this District Court's General Rule ("GR") 12(m) (cited "P. 12(m)—" and "D. 12(m)—"). But because neither side tendered a statement in opposition as called for by GR 12(n), and because the two GR 12(m) statements do not speak the same language, this Court has been compelled to resort pretty much on its own to the depositions and documents filed with the motions in its effort to piece the facts together.

off-set web printing press industry at Baker Perkins Printing Machinery Corporation (after a 1987 acquisition the company became "APV Baker PMC Limited"—for simplicity's sake, both will be referred to simply as "Baker"). Scherer acted as Baker's President and General Manager beginning in 1970 and helped to build the company from its inception to a sales revenue of $77 million for the year 1988.

On March 31, 1989 Rockwell purchased Baker. At that time Scherer headed Baker's United States sales subsidiary headquartered in Schaumburg, Illinois. Scherer was then reporting to Baker's managing director Michael Leggatt ("Leggatt") and supervised approximately 80 employees, at least half of whom were female.

Under the terms of the acquisition, Rockwell assumed all obligations of Baker, including employment contracts. One of those was a 1984 letter agreement between Baker and Scherer (the "Agreement").[2] Leggatt had negotiated the Agreement with Scherer, explaining that the reason for the Agreement was that Scherer had received an offer from another company and that if he were to stay at Baker he wanted improvements in his overall benefits and compensation as well as the assurance that those benefits would not be cut off without notice (Leggatt Dep. 120, P.Mem.Ex.).

Among the relevant portions of the Agreement (Complaint Ex. A) is paragraph 5:

This agreement and your employment shall cease without notice on the last day of the month in which you attain the age of 65 years but subject thereto the employment may be terminated at any time by the Company giving you written notice effective on a date not less than three years from the date of giving such notice. If the Company so terminates this agreement and your employment (other than for reasons contained in paragraph 13), the Company shall continue to pay you an amount equal to your salary, bonus and benefits for the lesser of the following three years or the expiration of the term of this agreement (absent such termination). If you have earned income within this period (from a job or from self-employment), the total amount of your earnings and benefits shall be deducted from the amount otherwise payable by the Company. In determining the total amount payable by the Company during the period, your salary shall be computed at the rate in effect at the time of such notice and the bonus shall be equal to the average bonus for the three immediately preceding financial years. Your employment may also be terminated by you giving three years prior written notice to that effect to the Company at any time.

Paragraph 13 (cross-referenced in paragraph 5) provided:

If at any time during the employment you

(a) shall be guilty of any gross default or misconduct or material breach or non-observance of any of the stipulations herein contained, or

(b) shall absent yourself from the Company without leave except to attend to other duties with the permission of the Company or except in the case of illness or accident, or

(c) shall intentionally disobey or intentionally neglect any lawful orders or directions of the Board of Directors or of the Company, or

(d) shall be adjudicated bankrupt,

then in any such case the Company may terminate your employment forthwith without any notice.

---

**2.** Although the text of the Agreement (a letter from Baker to Scherer occupying just over five single spaced pages) was typewritten, the date on page 1—"27 January 1984"—was handwritten. On page 6, the signature page, Scherer's acceptance bore a handwritten date of "August 1, 1984" according to the photocopy as Complaint Ex. A, but the slightly different handwritten date of "August 3, 1984" according to the photocopy at D. 12(m) App. 207–12. Both the existence of those divergent photocopies and the gap of over six months between the January and August dates on the first and last pages of the document have piqued this Court's curiosity, but those disparities do not bear on any of the issues posed by the current motions—so neither side has found it necessary to provide any explanation.

One other provision of the Agreement is relevant to the present controversy—its post-employment restrictive covenant in paragraph 11:

> You will not within three years after ceasing to be employed by the Company without the previous consent of the Company in writing on your own behalf or on behalf of any person, firm or company directly or indirectly seek to procure orders from or do business with any person, firm or company who has at any time during the three years immediately preceding the cessation of your employment with the Company done business with the Company or with any associate of the Company provided always that nothing in this paragraph shall be deemed to prohibit the seeking or procuring of orders or the doing of business not related or similar to the business or businesses aforesaid or any of them.

On one or two occasions in April and May 1989, Rockwell's Vice President of Human Resources Richard Luzzi ("Luzzi") and Vice President and General Manager of the Commercial Products Division William Boston ("Boston") attempted to renegotiate the compensation terms of Scherer's Agreement. Both Luzzi and Boston were concerned that the compensation level was excessive in comparison to compensation normally received in such a position,[3] but Scherer refused to renegotiate, saying "I will honor my contract" (Scherer Dep. 216, D. 12(m) App. 8).

Finally at a convention in late May 1989, Boston told Scherer that Rockwell would honor the Agreement by giving him the three-year notice called for in paragraph 5. Scherer's understanding was that they would talk again in two and a half years to see whether Scherer wanted to stay with Rockwell and that in the meantime he would stay with the company (id. 227, D. 12(m) App. 12). Nor did Boston or Luzzi intend that Scherer would leave Rockwell upon the giving of the notice (Luzzi Dep. 48, 50, D. 12(m) App. 89, 90; Boston Dep.

69, D. 12(m) App. 156). Luzzi directed the legal department to draw up a notice, the draft of which stated (D.R.Mem., Leggatt Dep.Ex. 1):

> In accordance with the terms of the employment contract between you and Baker Perkins PMC, dated 27 January 1984, this letter will serve as written notice of termination of the employment contract, effective three years from date of this notice. Accordingly, the termination shall be effective as of May 31, 1992.

That notice was never delivered to Scherer, however, due to the events that followed.

In early June 1989 Scherer's secretary Terry Pendy ("Pendy") spoke with Luzzi about various incidents of sexual harassment by Scherer. Pendy testified to and related to Luzzi the following history of unwanted sexual advances: In about December 1988, three months after she first began working for Scherer, he began to harass her sexually. In the beginning offensive comments occurred once every two to three weeks, but by the end they occurred daily (Pendy Dep. 39, D. 12(m) App. 49). He made comments about her breasts 15 to 30 times (id. 43, D. 12(m) App. 53). On one occasion, when they went to lunch together for Secretary's Day, he touched her two times in what she considered to be an offensive manner—she became very upset with him and demanded that he never do that again (id. 60, D. 12(m) App. 57). On another occasion Scherer tried to grab her in his office and she ran out yelling for another secretary. When the other secretary demanded that Scherer "stop touching that woman" (id. 62, D. 12(m) App. 59), he laughed and said "Well, she touches me all of the time" (id.).

Scherer also told her that he told others that the two of them were having an affair (Pendy was married), and Pendy said that Scherer also told another employee that "he was fucking me and to leave me alone because I was his" (id. 66, D. 12(m) App. 61). When she questioned him about her raise once, he told her that if she per-

---

**3.** For example, in 1988 Scherer received between $350,000 and $400,000 under the Agreement, approximately twice the amount that Rockwell would ordinarily pay for a person in a comparable position.

formed favors on the side—and she took that to mean sexual favors—she could receive bonuses. Scherer also repeatedly asked her out for drinks and once asked her to go to his cabin in Michigan, all of which importunings she refused (*id.* 105, D. 12(m) App. 72). Pendy found all of those advances offensive. She told Luzzi that she feared retaliation if Scherer found out and that she had discussed the harassment with her husband, who had told her she should quit (Luzzi Dep. 65, D. 12(m) App. 99). Luzzi told her that her claims would be taken seriously (*id.*).

To investigate those claims further and in response to a concern over high turnover of Baker employees since the acquisition, Luzzi initiated an organization audit. It was conducted on the premises of the Schaumburg facility on June 12 and 13, 1989 by Joseph Burton Salter, Jr. ("Salter"), an investigator from Rockwell's Human Resources Department in California. In a memo sent out by Luzzi, all employees were invited to participate. That memo stated (P.Mem.Ex. C):

> The purpose of this audit is to determine trends in the work place that may have contributed to the recent turnover of employees as well as determine other sources of employee discontent.
>
> Upon managements [sic] review of the results, we will determine what actions, if any, are necessary. We will communicate results to all of you as appropriate.
>
> In order to maximize the organization audit process, it is important that all of you communicate openly and candidly about matters which you feel are important. You are not limited to any specific subject or matter, so please feel free to speak what is on your mind.
>
> Our pledge to you is that anything you say will be held strictly in confidence. No names will be attached to any of the data and only trend data will be analyzed.

We hope as a result of this audit, we can improve the quality of work life and help rectify your matters of concern.

Salter was told of the claims of sexual harassment against Scherer (Salter Dep. 67, D. 12(m) App. 191) and was not told to interview Scherer, who he understood was leaving on a business trip and would not be there at the time of the audit (*id.* 89–90, D. 12(m) App. 196–97). Salter was not told he would be investigating the activities of a particular individual, nor was he told to address the claims of sexual harassment against Scherer specifically (*id.* 49, 68, D. 12(m) App. 189, 192). Instead he asked interviewees general questions about the work environment, including sexual harassment (Salter's June 22, 1989 memo as to his interview introduction procedure, D. 12(m) App. 301). Through that audit Salter produced notes of numerous interviews (see D. 12(m) App. 213–98) where employees reported personal instances of sexual harassment by Scherer or observed instances of such conduct by Scherer toward Pendy and other women. As to personal experiences besides Pendy's, several other female employees related experiences of unwelcome sexual advances by Scherer—including touching and invitations for drinks, dinner or a trip to his Michigan cottage. Those interviewed also reported Scherer's general lack of concern for his employees and some questionable business conduct, such as having employees do personal work for him.

Salter summarized the results of his interviews orally to Luzzi, Boston and Rockwell President James Cavanaugh ("Cavanaugh"). Luzzi decided to suspend Scherer without pay, and on June 15, 1989 Boston told Scherer that he was suspended.[4] Possibility of a settlement was discussed—Rockwell offered to pay Scherer one year's base salary if he resigned—but ultimately Scherer was terminated at a meeting with Leggatt, Luzzi and Boston on June 27, 1989. On July 14, 1989 Luzzi sent Scherer a letter stating (P.Mem.Ex. D):

---

**4.** Scherer and Rockwell disagree on when Scherer discovered the charges of sexual harassment. Boston said Scherer was told of the charges at the same time he was told of the suspension (Boston Dep. 98, D. 12(m) App. 161), but Scherer contends he found out through a customer three or four days after June 15 (Scherer Dep. 80–81, D. 12(m) App. 3). That factual disagreement is nonmaterial.

Based upon our investigation, you will be discharged for violation of federal and state laws, as well as Company policy,[5] relating to sexual harassment and violation of standards of business conduct. Your conduct clearly constituted misconduct within the scope of paragraph 13 of the agreement signed by you and Rockwell PMC, Inc., and accordingly, you are terminated because of your misconduct.

Luzzi additionally wrote that he would remain available until the end of the month to discuss the possibility of an amicable resolution.

Scherer's wife opened the July 14 letter, although it had been addressed to him. Additionally, sometime after June 15, 1989 Scherer had separate conversations with at least three individuals associated in some capacity with Rockwell, each of whom told him they had heard that he had been discharged because of allegations of sexual harassment.[6]

Scherer filed this action in the Circuit Court of Cook County, asserting three claims:

1. Due to its unreasonable scope, Agreement ¶ 11's post-employment restrictive covenant should be declared invalid, or alternatively that covenant should be declared unenforceable due to Rockwell's willful breach of the Agreement (Count I).

2. Rockwell breached the Agreement by terminating him wrongfully and without notice (Count II).

3. Rockwell circulated accounts of Scherer's sexual harassment that were false, libelous and defamatory per se (Count III).

Rockwell removed this action to this Court under 28 U.S.C. § 1441 pursuant to this Court's diversity jurisdiction.

### Breach of Contract

This opinion first addresses Scherer's allegation that Rockwell breached his Agreement, both because the other claims depend upon it and because Scherer focuses all of his attention on that claim in his own Rule 56 motion. In that respect our Court of Appeals has held that "[d]isputes over interpretations of 'just cause' provisions are resolvable by summary judgment where there is no genuine issue of material fact" (*S.J. Groves & Sons Co. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 627*, 581 F.2d 1241, 1244 (7th Cir. 1978) (footnote omitted)).

▪ In essence the parties disagree over the meaning of the word "misconduct" found in Agreement ¶ 13(a), pursuant to which Rockwell terminated Scherer.[7] Ac-

---

**5.** [Footnote by this Court] Rockwell's policy on sexual harassment reiterated the major provisions of the Equal Employment Opportunity Commission's guidelines, stated the responsibility of the employer to guard against such occurrences and continued (D. 12(m) App. 334):

> The Corporation is committed to providing its employees with a working environment free of all forms of discrimination, including sexual harassment. Therefore, any employee conduct that results in sexual harassment of other employees will not be tolerated and appropriate action will be taken.

**6.** Those individuals were:

1. Earl Segerdahl of Segerdahl Company, a Baker customer, who told Scherer that he had heard from a Baker employee that Scherer was placed on leave of absence due to sexual harassment charges (Scherer Dep. 80–81, 430–31, D. 12(m) App. 2–3, 25–26);

2. Ken Ringman, an employee of Graphic Sales Associates, a Rockwell supplier, who stated that he was told by someone at Rockwell that Scherer had been fired for having an

affair with a customer's wife and that 17 or 18 female employees had accused Scherer of sexual harassment (*id.* 432–34, D. 12(m) App. 27–29); and

3. Jim Rifenbergh, President of Brown Printing, who told Scherer that he had heard the "wildest scenarios" about Scherer's discharge including, after Scherer raised the subject, sexual harassment (*id.* 437–38, D. 12(m) App. 30–31).

**7.** Rockwell asserts that Scherer was also terminated for "gross default" under paragraph 13(a). That might also have been a plausible ground for termination, and there is case law suggesting that Rockwell may assert it now (see, e.g., *De Bono v. Chicago Sun–Times, Inc.*, 707 F.Supp. 363, 367 (N.D.Ill.1989), quoting an asserted principle of Illinois law as stated in *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 591 F.Supp. 812, 820 (N.D.Ill.1984), *aff'd*, 766 F.2d 1007 (7th Cir.1985) ("[T]he party terminating a contract may assert any grounds justifying termination, whether or not it announced those grounds at the time of termination; the court

cording to Scherer's interpretation, all four of the terms "gross default," "misconduct," "material breach" and "non-observance" are modified by the phrase that follows—"of any of the stipulations herein contained"—and hence any alleged "misconduct" must relate to stipulations found in the Agreement. Scherer further argues that the only such "stipulations" contained in the Agreement are the fiduciary duties listed in paragraph 9—duties that do not encompass sexual harassment.[8] Rockwell on the other hand contends that the term "misconduct" stands on its own, that the phrase must be read as disjunctive in the following manner: "gross default *or* misconduct *or* material breach or non-observ-

ance of any of the stipulations," so that only the last two items relate to the Agreement's stipulations.

Under Illinois law[9] whether a contract is ambiguous is a question of law (*City of Clinton, Illinois v. Moffitt*, 812 F.2d 341, 342 (7th Cir.1987), citing *Wilson v. Benedictine College*, 112 Ill.App.3d 932, 937, 68 Ill.Dec. 257, 263, 445 N.E.2d 901, 907 (2d Dist.1983)). Ambiguity is present only if the contract is reasonably and fairly susceptible to different constructions when read in its plain and ordinary meaning (*Manor Healthcare Corp. v. Soiltest, Inc.*, 192 Ill.App.3d 934, 940, 140 Ill.Dec. 68, 72–73, 549 N.E.2d 719, 723–24 (1st Dist. 1989)). Furthermore, an ambiguity is not

does not inquire whether those grounds actually motivated the party to terminate the contract")). This Court, however, is troubled by the use of post-hoc rationalizations as the sole basis for validating an otherwise invalid contract termination (something akin to the shifting of legal positions that courts often bar by invoking the proposition that a litigant cannot "mend its hold") (see *Harbor Insurance. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362–65 (7th Cir.1990); *Shacket v. Roger Smith Aircraft Sales, Inc.*, 651 F.Supp. 675, 695 (N.D.Ill.1986)). Indeed, in *First Commodity Traders*, 591 F.Supp. at 821 then District Judge Susan Getzendanner sought to distinguish earlier Illinois cases applying that no-shifting-your-ground approach (though not under the colorful "mend your hold" label), though the affirmance of that case on appeal rested on a different principle (766 F.2d at 1013). This Court, however, has long been familiar with the "mend your hold" principle from early days in the practice of law, and it has consistently followed that principle in such cases as *Shacket*—and now that the subject has been so studiously explored and endorsed by our Court of Appeals in *Harbor Insurance*, this Court sees no reason to depart from applying the doctrine faithfully. But it turns out to make no difference, for even more importantly, as will be discussed later (and as seems obvious on the face of it) sexual harassment is clearly "misconduct," while it is less clearly a "default." This opinion therefore need not address the weaker "default" alternative rather than treating it as unnecessary surplusage. Parenthetically, neither party has also discussed the paragraph 13(c) provision that no notice of termination is required if Scherer "shall intentionally disobey or intentionally neglect any lawful orders or directions of the Board of Directors or of the Company." If Rockwell had requested that Scherer cease sexually harassing female employees in the office and he had refused, that provision might have come into play. Finally Rockwell's policy against sexual harassment,

standing on its own, might possibly be said to direct—by implication—its employees to refrain from sexual harassment, but this Court does not decide that here.

8. Paragraph 9 provided:

You shall not except in the proper course of your duties either during the continuance of employment or thereafter divulge to any person whomsoever and shall use your best endeavours to prevent the publication or disclosure of any trade secrets or manufacturing processes or any information concerning the business or finances of the Company or of any of its associated companies or any of its or their dealings, transactions or affairs which may come to your knowledge during or in the course of the employment. Except as may otherwise be agreed with the Company you should devote your whole time and attention to the affairs of the Company and shall not during the employment be personally employed or engaged in any capacity whatsoever in or in connection with any business whatsoever other than the business of the Company without the consent of the Company in writing.

9. In diversity cases this Court must apply the choice of laws principles of the forum state (*Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Illinois choice of law principles look to the law of the state with the most significant contacts (*Palmer v. Beverly Enterprises*, 823 F.2d 1105, 1109–10 (7th Cir.1987)). Here both contracting parties were located in Illinois, and the contract was made and performed in Illinois (diversity of citizenship exists between Baker's successor in interest Rockwell, a California–Delaware citizen under 28 U.S.C. § 1332(c)(1), and Illinois citizen Scherer). Not only does Illinois meet the most-significant-contacts test but both parties agree that the law of Illinois controls.

established by mere disagreement of the parties over the meaning of the language (*id.; Newman–Green, Inc. v. Alfonzo–Larrain R.*, 612 F.Supp. 1434, 1437 (N.D.Ill. 1985)).

No ambiguity can be said to exist here: Paragraph 13(a) lends itself to only one interpretation—that favoring Rockwell. No natural reading of paragraph 13(a) can lead to the conclusion that "misconduct" is really, in full, "misconduct of any of the stipulations." Such a construction is grammatically awkward and nonsensical. Scherer tries to shift the focus from that obvious (and dispositive) issue by urging that "default"—which precedes "misconduct" in the sentence—cannot stand on its own, that one must be in default "of" something. But "default" is defined in *Webster's Third New International Dictionary* 590 (1976) ("*Webster's*") as "failure to do something required by duty or law: NEGLIGENCE, NEGLECT." In that sense, "gross default" equates to "gross negligence" or "gross neglect," common legal descriptions of the duty or standard of care owed by an individual, the exact meanings of which need not be precisely defined by a modifying phrase but whose parameters are typically defined according to the facts in any given set of circumstances. Additionally, because the terms "material breach or non-observance" descriptively cover any and all possible violations of the "stipulations," Scherer's proposed reading that the terms "gross default or misconduct" also refer to the "stipulations" would add nothing—those terms would be wholly redundant and unnecessary. Plainly the terms "gross default" and "misconduct" make the most grammatical, legal and common sense as separate, complete ideas.

■ Furthermore, as Rockwell notes, it would be wholly illogical to construe the terms "gross default or misconduct" as referring only to the "stipulations" of the Agreement contained in paragraph 9. Not only does paragraph 13 not state that it is limited by paragraph 9—certainly if Baker had so intended, it would have stated explicitly in paragraph 13(a) that Scherer would be fired for breaches or omissions of paragraph 9—but in addition such a reading would severely limit Baker's ability to deal with many obvious derelictions of duty not mentioned in paragraph 9, such as misappropriation of corporate funds or breaches of common law or statutorily imposed fiduciary duties. Paragraph 9 reflects Rockwell's primary concern over Scherer's not revealing trade secrets and other information and over his being a full-time employee in exchange for his handsome compensation, rather than an all-embracing concern over Scherer's general duties as an employee. Paragraph 13, on the other hand, is a broadly-phrased termination clause that, read as a whole, is plainly meant to cover most situations in which an employer may want to fire an employee for good cause. Reading all four terms as modified by the "stipulations" of paragraph 9 would make the use of four separate terms meaningless and would effectively give Rockwell only one restricted reason to terminate Scherer. This Court therefore holds that "misconduct" is a separate reason, unrestricted by any other portion of the Agreement, for terminating Scherer's employment under paragraph 13(a).[10]

■ Scherer argues next that if paragraph 13(a) is read in that manner, then "misconduct" alone and unmodified is

---

**10.** One other possible construction, not suggested by either litigant, bears mention: that the adjective "gross" modifies "misconduct" as well as "default"—a sort of variant on the principle of common-sense reading of English language usage that, translated into legalese, bears the fancy label of *reddendo singula singulis.* That is certainly a plausible reading of Agreement ¶ 13(a), but it would make no difference here: Scherer's repeated and egregious pattern of sex-

ual harassment as disclosed by Rockwell's impartial investigation, manifested toward more than one female employee, certainly qualifies as "gross misconduct" as well as "misconduct" without any pejorative modifier. Although this opinion goes on to discuss the matter in terms of "misconduct" alone, this Court's conclusions would be identical if Rockwell's right to terminate Scherer without three years' notice were framed in terms of "gross misconduct" instead.

vague and ambiguous.[11] Here is how *Webster's* at 1443 defines "misconduct" (italics in original):

> 1: mismanagement esp. of governmental or military responsibilities 2: intentional wrongdoing: deliberate violation of a rule of law or standard of behavior esp. by a government official: MALFEASANCE 3a: bad conduct: improper behavior b: sexual immorality; *esp:* ADULTERY.

"Misconduct" in the context of an employment contract can unambiguously be understood to signify such "mismanagement," "intentional wrongdoing" or "bad conduct" in relation to the employment (see *De Bono,* 707 F.Supp. at 366–67, finding a termination provision in employment contract for "acts of misconduct" was unambiguous [12]). Indeed, such a definition is entirely consistent with the implied contractual obligation on the part of an employee to observe elementary principles of good behavior (9 Williston, *Contracts* § 1014A, at 59–66 (3d ed. 1967)). Williston, *id.* at 60 (footnotes and their case citations omitted) provides this guidance on such a standard:

The behavior of the employee, and doubtless in some degree that of the employer, must also not be so dishonest, indecorous or immoral even aside from matters connected with the employment as to be inconsistent with its character. The extent to which such behavior will justify a termination of the contract must vary widely with the nature of the employment and to some extent with the customs of the community. In the common-law relations of master and servant and principal and agent, as in common-law relations in general, the matter depends upon what is reasonable under the circumstances.

██  Hence any purported ambiguity—or more accurately the absence of ambiguity—in the term "misconduct" must be measured not in isolation but rather in relation to the situation—here, the normal and reasonable expectations of the employer as to job performance (see, e.g., *De Bono,* 707 F.Supp. at 366–67 (employee's refusal to repay loan could reasonably be seen as an "act of misconduct" justifying termination)). Scherer confuses the notion of

**11.** For that proposition, Scherer relies in part upon a few cases that held the term "misconduct" as found in various statutes unconstitutionally vague—see, e.g., *Giaccio v. Pennsylvania,* 382 U.S. 399, 404, 86 S.Ct. 518, 521, 15 L.Ed.2d 447 (1966) (holding that a jury instruction using the term "some misconduct" could not save a wholly standardless statute permitting the assessment of court costs against an acquitted criminal defendant); *Soglin v. Kauffman,* 418 F.2d 163, 167–68 (7th Cir.1969) (students could not be disciplined by university for asserted "misconduct" where no such standard was defined in advance: "This rationale would justify the *ad hoc* imposition of discipline without reference to any preexisting standards of conduct so long as the objectionable behavior could be called misconduct at some later date" (*id.* at 167)). But such cases are wholly inapposite here (1) where the parties negotiated directly at arm's length for a "misconduct" standard—and this was a negotiation between two parties of comparable bargaining power, not a contract of adhesion, and (2) where the violative conduct fell well within any reasonable reading of that standard.

**12.** Scherer seeks to explain away *De Bono* by the fact that under the employment contract there "misconduct" was to be determined by specifically designated executives of the employer, while the Agreement had no corresponding

provision. Any notion that such a provision renders the two situations legally distinguishable is truly bizarre—not only is that a distinction without a difference, but if anything it could arguably cut *against* rather than in favor of Scherer. That is so because some cases deal with provisions that vest the power of decision in a party as granting an absolute right of subjective satisfaction to that party—the approval of a commissioned painting is a textbook example. Most contracts with such provisions, however, are treated as requiring the decision to be exercised reasonably—just as *De Bono,* 707 F.Supp. at 366 (citation omitted) held to be the proper construction of that contract under its terms to that effect:

> Thus, if any reasonable jury would find that the persons authorized in the Contract made a reasonable finding that plaintiff performed improperly or committed acts of misconduct, defendant is entitled to summary judgment.

Because that is precisely the same test by which the conduct of Rockwell's decisionmakers is being evaluated by this Court, the facts that the decisionmakers were not designated in the Agreement or that the Agreement does not expressly require Rockwell to be reasonable in determining "misconduct" are total irrelevancies. *De Bono* and this case are wholly parallel in terms of the legal principle applicable to the "misconduct" standard.

language having more than one meaning looking in different directions—in other words, meanings that are at odds with one another, thus creating an ambiguity—with language meaning more than one thing but having a common thrust, as when a word such as "misconduct" covers as many factual situations as may qualify as improper behavior for an employee. That latter situation does *not* create an ambiguity.

As applied in this case, there can be no doubt that allegations of sexual harassment, exposing the employer to the potential for liability in violation of federal law (see *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 69–73, 106 S.Ct. 2399, 2406–2408, 91 L.Ed.2d 49 (1986)), falls outside of any definition of "reasonable" behavior that may be constructed under Williston's definition and well within any definition of "misconduct," most particularly "deliberate violation of a rule of law." In the plain and ordinary meaning of the term, no employee could rationally believe that such behavior that violates federal law as well as company policy would not be understood as "misconduct." This Court finds that the term "misconduct" is not ambiguous as a matter of law and that Rockwell was entitled to terminate an employee for sexual harassment under the language of paragraph 13(a).[13]

■ Scherer further argues that Rockwell violated its contractual obligation under Illinois law to exercise good faith and fair dealing (see *King v. Telesphere International, Inc.,* 632 F.Supp. 981, 984 (N.D. Ill.1986) and Illinois cases cited there). Scherer claims that Rockwell used allegations of sexual harassment as a pretext for firing him without notice under paragraph 13(a) in order to get out of the admittedly expensive Agreement.

This Court vehemently rejects the proposition that simply because Rockwell was unhappy (as it admittedly was) with its financial burdens under the Agreement, Rockwell would be held as having per se acted in bad faith by discharging Scherer without notice upon discovering that he was sexually harassing employees. Plainly Rockwell could terminate Scherer on the basis of the investigation that followed—and that provided strong confirmation of—Pendy's allegations. Rockwell need not establish sexual harassment by a preponderance of the evidence, as a court must, but could surely terminate him for "misconduct" found reasonably and in good faith (see *De Bono,* 707 F.Supp. at 366). More than ample evidence existed for a good faith determination that Scherer, who has produced no evidence to the contrary but only his bare denials, had engaged in sexual harassment.

Furthermore, Pendy—through whom Rockwell first heard of any misconduct by Scherer—came forward entirely on her own. Hence the timing of the investigatory audit, though it came on the heels of Rockwell's decision that it would give Scherer notice under paragraph 5, was coincidental rather than devious (indeed, if Rockwell had wanted to fabricate evidence, it might have made more sense to do so *before* it talked of bringing paragraph 5 into play). Therefore, in spite of—or alongside of—whatever motivations Rockwell may have had to terminate an expensive contract, it had every right to terminate Scherer for sexual harassment.[14]

---

**13.** That last phrase is the key here—after all, Rockwell had the right (and indeed the obligation) in any case to terminate Scherer based upon the results of its investigation of the allegations. As stated in *Anderson v. Hewlett–Packard Corp.,* 694 F.Supp. 1294, 1304 (N.D.Ohio 1988), a case involving plaintiff's discharge for sexual harassment:

It should be clear to corporate America, by now, that the law does not tolerate the type of behavior [plaintiff] exhibited. The termination of employees who behave as [plaintiff] did is justified and lawful.

　　*　　*　　*　　*　　*

This Court unhesitatingly concludes that [plaintiff's] actions not only violated [company] guidelines and policies, but were more than likely illegal under federal law....

What is rather in question here is whether Scherer was entitled to three years' pay upon such termination under paragraph 5 or no pay under paragraph 13(a).

**14.** Scherer further argues that even if Rockwell had a good faith belief in the allegations, it used

Furthermore, Boston testified (Boston Dep. 147, D. 12(m) App. 167) that it was most certainly not in the best interests of Rockwell to terminate a breadwinner such as Scherer and that both he and Luzzi had originally hoped to keep him working after the three years had expired on the Agreement under paragraph 5. On that note, Scherer attempts to bolster his pretext argument by arguing that he had actually already been terminated under paragraph 5, despite all evidence to the contrary: Both sides testified that they believed that Scherer would continue to work for the three year period after the notice was given, the notice itself set the termination date as 1992—and perhaps most critically—the notice was never delivered. Scherer tries to argue that paragraph 5 is at the least ambiguous, but it reads very clearly: "written notice *effective* on a date not less than three years from the date of the giving of such notice." No reasonable interpretation of the Agreement in conjunction with the factual situation here could lead to the conclusion that Scherer had already been terminated—even if the hurdle of the notice not having been given were somehow overcome.

■ Finally, Scherer tries one last tack on a breach of contract claim. It is equally flawed. He argues (1) that the memorandum sent by Luzzi to all of the employees notifying them of the audit set up a contractual relationship of the type recognized in *Duldulao v. St. Mary of Nazareth Hospital Center*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987) and (2) that Rockwell breached its obligations under that relationship. *Duldulao* held that in certain circumstances employer promises set out in company handbooks or personnel policies create binding obligations between the employer and employee. But the *Duldulao*-described circumstances involve bargained-for substantive and procedural rights of employees (*id.* at 489–90, 106 Ill. Dec. at 12, 505 N.E.2d at 318) such as

hiring and firing policies—and then "only when specific procedures have been prescribed by positive and mandatory language" (*Doe v. First National Bank of Chicago*, 865 F.2d 864, 872 (7th Cir.1989) (Illinois case citations omitted); *Torres v. Amoco Corp.*, 186 Ill.App.3d 135, 139, 134 Ill.Dec. 154, 156, 542 N.E.2d 154, 156 (1st Dist.1989)).

At issue here is a memorandum describing an internal audit in which an employee could choose to participate or not. In no way did that memorandum create a bargained-for exchange setting up fundamental employee rights by means of detailed specific procedures. This Court flatly rejects Scherer's claim that because Rockwell broke its promise to keep the information from the audit confidential, it may not use the results of that audit to terminate Scherer. That claim has no basis in legal principle.

*Post–Employment Restrictive Covenant*

As already explained, Scherer launches a double-barreled attack on paragraph 11's post-employment restrictive covenant: It is either (1) void for overbreadth or (2) unenforceable because Rockwell breached the Agreement. Those alternatives will be explored in that order.

Every post-employment covenant must be "reasonably necessary to protect the interests of the employer" (*McRand, Inc. v. van Beelen*, 138 Ill.App.3d 1045, 1051, 93 Ill.Dec. 471, 476, 486 N.E.2d 1306, 1311 (1st Dist.1985) (citation omitted)). It will be enforced "if it is reasonable in geographical and temporal scope and it is necessary to protect a legitimate business interest of the employer" (*Shapiro v. Regent Printing Co.*, 192 Ill.App.3d 1005, 1010, 140 Ill. Dec. 142, 144, 549 N.E.2d 793, 795 (1st Dist.1989) (citation omitted)).

■ Before the issues bearing on reasonableness are ripe for consideration, however, two preliminary determinations

them as a pretext to fire him without notice because it *could have* solved its legal obligations by terminating him under the provisions of paragraph 5 and paying him for the next three years. It goes without saying how absurd is the

notion that to avoid a claim of bad faith Rockwell should ignore its rights to terminate without notice and thus give Scherer three years' pay and benefits as a windfall.

are required as to the covenant: (1) it must be ancillary to a valid contract and (2) it must be supported by adequate consideration (*Millard Maintenance Service Co. v. Bernero*, 207 Ill.App.3d 736, 744, 152 Ill. Dec. 692, 697, 566 N.E.2d 379, 384 (1st Dist.1990)). Both those criteria are certainly satisfied here. First, the covenant was subordinate to the main purpose of the Agreement, which was to provide security and benefits for Scherer's continued employment at Baker. Second, continued employment for a "substantial period" represents adequate consideration for a post-employment non-competition covenant (*id.* at 745, 152 Ill.Dec. at 697, 566 N.E.2d at 384, quoting *Corroon & Black of Illinois, Inc. v. Magner*, 145 Ill.App.3d 151, 163, 98 Ill. Dec. 663, 669, 494 N.E.2d 785, 791 (1st Dist.1986), and *McRand*, 138 Ill.App.3d at 1055, 93 Ill.Dec. at 478, 486 N.E.2d at 1313). Here Scherer signed the Agreement in 1984 and was assured employment for at least three years under the paragraph 5 notice provision.[15] That is surely a "substantial period" such as to constitute sufficient consideration according to Illinois law (cf., e.g., *Corroon & Black*, 145 Ill.App.3d at 163, 98 Ill.Dec. at 670, 494 N.E.2d at 792 (finding something less than five years sufficient)).[16]

As for the reasonableness of the covenant, that is a function of whether the employer was seeking to protect a legitimate business interest. There are two situations in which Illinois courts have found a protectible interest (*Label Printers v. Pflug*, 206 Ill.App.3d 483, 491, 151 Ill. Dec. 720, 725, 564 N.E.2d 1382, 1387 (2d Dist.1991) (citations omitted)):

 (1) where, by the nature of the business, plaintiff has a near-permanent relationship with its customers and but for his employment, defendant would not have had contact with them; or (2) where the former employee learned trade secrets or acquired other confidential information

through his employment with [the employer] and subsequently attempted to use it for his own benefit.

But this Court is spared the need to probe those issues by Scherer's waiver of any claimed defect in that respect—so that the only issues in this case as to the restrictive covenant are those directly impacted by this opinion's already-announced ruling on Rockwell's right to fire Scherer.

Complaint Count I has focused almost entirely on the circumstances of Scherer's termination and the claimed unenforceability of the restrictive covenant because of Rockwell's allegedly improper conduct in firing him. Only one paragraph (Count I ¶ 18) and a piece of another (Count I ¶ 23) had referred to the covenant's asserted inherent flaws:

 18. The restrictive covenant is unreasonable in its scope and length of time.

 23. Scherer must obtain employment as soon as possible. Scherer does not believe he is bound to the restrictive covenant as a consequence of Rockwell's improper conduct, the unfair and overly broad provisions relating to scope and time, and the intent of the parties to the restrictive covenant.

Neither of those allegations was admitted by Rockwell (hardly a surprise).

Originally Scherer did attack the covenant on grounds of possible overbreadth, and he actually launched a Rule 56 motion directed to that issue back in 1989. But that motion was promptly placed on the back burner because both parties agreed to the need for extensive merits-related discovery in this action. And on September 11, 1990 (before the briefing schedule on the current motions was established), Scherer's counsel represented this as part of his Motion To Open Discovery tendered on that date:

 Through the discovery obtained to date, plaintiff and defendant have come to an

---

**15.** Scherer cannot complain that *his own misconduct* could subject him to earlier termination, somehow vitiating the consideration represented by Rockwell's undertakings or converting what would otherwise be a "substantial period" into an insubstantial one.

**16.** In fact Scherer remained employed until 1989—about five years after the Agreement was entered into. That longer period of employment would not seem to control, for ordinarily consideration is looked at as of the date of contracting.

understanding that the restrictive covenant is enforceable according to its tennor [sic].

Scherer's counsel has since reconfirmed that any claims on his part as to any asserted unreasonableness or overbreadth of the restrictive covenant have been waived, and this Court accordingly need not address that subject.

■ As for Scherer's second proposition that the restrictive covenant is assertedly unenforceable because Rockwell breached the Agreement, that is no longer an issue because this Court has determined that Rockwell did not breach the Agreement.[17] Scherer's Agreement is still intact and he must abide by a valid restrictive covenant.

### Defamation

Finally, Scherer's Complaint sets out a claim of defamation per se—still another contention that he never revisits in his summary judgment motion. According to Illinois law [18] as summarized in *Marczak v. Drexel National Bank,* 186 Ill.App.3d 640, 644, 134 Ill.Dec. 441, 443, 542 N.E.2d 787, 789 (1st Dist.1989) (citations omitted):

A defamation is the publication of anything injurious to the good name or reputation of another, or which tends to bring him or her into disrepute. The gravamen of an action for defamation is the damage to plaintiffs reputation in the eyes of other persons. Words are held to be defamatory *per se* where they impute: (1) commission of a criminal offense; (2) infection with a communicable disease; (3) inability to perform, or want of integrity to discharge duties of office or employment; and (4) prejudicing a particular party in his trade, profession or calling.

For language to be defamatory per se, the test is that "it must be so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary" (*Owens v. CBS, Inc.,* 173 Ill. App.3d 977, 989, 123 Ill.Dec. 521, 530, 527 N.E.2d 1296, 1305 (1988) (citation omitted)).

There is of course little question that if shown to be false, accusations of sexual harassment on the job—so obviously impugning the integrity of Scherer in the discharge of his employment duties and so incapable of innocent construction—would indeed constitute defamation per se (see Prosser & Keeton, *Torts* § 111, at 775 (5th ed. 1984), listing an accusation of improper advances toward women as coming within a congeries of things that are defamatory on their face, and citing *Jamison v. Rebenson,* 21 Ill.App.2d 364, 158 N.E.2d 82 (1st Dist.1959) for that proposition).

But Scherer's problem is that he has not shown the existence of a genuine issue of material fact as to more than one element of his claim, as set out in *Krasinski v. United Parcel Service, Inc.,* 124 Ill.2d 483, 490, 125 Ill.Dec. 310, 313, 530 N.E.2d 468, 471 (1988) (citing Restatement (Second) of Torts § 558 (1977)):

To make out a claim for defamation, the plaintiff must set out sufficient facts to show that the defendants made a false statement concerning him, that there was an unprivileged publication to a third party with fault by the defendant, which caused damage to the plaintiff.

*Trust & Savings Bank v. Sanders,* 631 F.Supp. 1393, 1396 (N.D.Ill.1986)).

---

**17.** Indeed, even if Rockwell had breached the Agreement in some way (as it has not), Scherer would not automatically have been allowed to escape the terms of the restrictive covenant. He would be excused from compliance "only if there has been a nonperformance of duty that is so material and important as to justify the injured party in regarding the transaction at an end" (*Wyatt v. Dishong,* 127 Ill.App.3d 716, 720, 83 Ill.Dec. 1, 4, 469 N.E.2d 608, 611 (5th Dist. 1984) (citation omitted)). One of the factors to consider in whether a breach is material is "whether the allowance of reciprocal non-performance will result in the accrual of an unreasonable and unfair advantage" (*Eastern Illinois*

**18.** In the tort field, Illinois choice-of-law principles look to the law of the state with the most significant relationship to the transaction in issue (*Ingersoll v. Klein,* 46 Ill.2d 42, 45, 262 N.E.2d 593, 595–96 (1970)). As with Scherer's contract claim, there is no question that the state possessing *all* relevant contacts to this action—in particular the place of any potential publication of the alleged defamation—is Illinois.

Indeed, two essential components of the defamation claim are wholly lacking.

 First, Scherer has done absolutely nothing to counter Rockwell's evidence of sexual harassment by producing affidavits, depositions, exhibits or, for that matter, even argument. Thus he has raised no genuine issue of material fact as to the falsity of the allegations.

 Even beyond that, Scherer has also not shown any unprivileged publication with fault on Rockwell's part.[19] Scherer claims several instances of publication to third persons:

1. the investigation, affidavits and Salter's communication of his findings to Boston, Luzzi and Cavanaugh;

2. Rockwell's letter addressed to Scherer at his home and opened by his wife;

3. various persons phoning Scherer and telling him they had heard of the allegations; and

4. rumors generally spread around the company.

As for the first of those, the communications are protected by a qualified privilege given to an employer investigating suspicious conduct by employees (*Jones v. Britt Airways, Inc.*, 622 F.Supp. 389, 392 (N.D. Ill.1985); *Beauvoir v. Rush-Presbyterian–St. Luke's Medical Center*, 137 Ill.App.3d 294, 300, 92 Ill.Dec. 110, 113, 484 N.E.2d 841, 844 (1st Dist.1985)). As for the second, there is no liability for publication that a defendant did not intend and could not reasonably anticipate, such as when a sealed letter sent to a plaintiff is unexpectedly opened by someone else (Prosser & Keeton, Torts § 113, at 803 & n. 59 and cases cited there). Finally, as for the third and fourth, Scherer has not offered a shred of evidence that Rockwell had intended to spread rumors or that it was connected with any spread of rumors.

In sum, Scherer has presented nothing at all to counter Rockwell's evidence in order to create a genuine issue of material fact such that Scherer's defamation claim can survive summary judgment. That claim must be dismissed for lack of proof.

### Conclusion

There is no genuine issue of material fact, and Rockwell is entitled to a judgment as a matter of law, on all of Scherer's claims. Rockwell neither breached the Agreement nor defamed Scherer, nor has Scherer established even a reasonable inference as to the invalidity or unenforceability of the restrictive post-employment covenant in the Agreement. This action is dismissed in its entirety.

---

**19.** For private individuals, the standard of fault is negligence at the least (*Owens*, 173 Ill.App.3d at 994, 123 Ill.Dec. at 533, 527 N.E.2d at 1308). *It rises to a standard of actual malice if a* qualified privilege comes into play due to the employer-employee relationship (*Krasinski*, 124 Ill.2d at 490, 125 Ill.Dec. at 313, 530 N.E.2d at 471).